## THE UNITED RAILWAYS AND ELECTRIC COM-PANY *vs.* ROSE CORBIN.

*Medical Experts—Evidence of Opinion as to Cause of Plain-
tiff's Injury—Opinion as to Mental Condition of Injured Per-
son—Exception to Testimony Not Waived by Cross-Examina-
tion of Witness—Shock to Plaintiff from Falling of Trolley
Wire in Street—Sufficiency of Evidence—Instructions—Spe-
cial Exception to Competency of Expert Witness Not Neces-
sary.*

When the question at issue is whether the plaintiff's injury was
the result of contact with a wire charged with electricity or
whether it was the result of having been frightened by a flash
from such wire, plaintiff's physician having testified that she
was suffering from hysteria, produced by a shock or injury
and not by disease, a medical witness, not qualified to testify
as an electrical expert, or as a medical expert acquainted with
the effects of electric currents, cannot be allowed to testify
that in his opinion the condition of the plaintiff was more
probably the result of an electric shock than the result of a
nervous shock from mere fright.

A medical witness ought not to be allowed to testify that the
nervous condition of the plaintiff, alleged to have been caused
by defendant's negligence, is such that it would not be proper
for her to marry, since his opinion, based entirely on plain-
tiff's nervous condition, must needs be more or less specu-
lative.

A physician of some years' experience as a practitioner, but who
is not an alienist or specialist in mental diseases, who attended

plaintiff when she received the injury complained of and afterwards, is entitled to testify as to his opinion of the ultimate effect of the injury upon her mind.

An exception taken to the admission of certain evidence when offered is not waived by the exceptant's afterwards cross-examing the witness as to such evidence.

A physician who testifies that he had had two electrical shocks himself and had had three patients suffering from such shocks, may be asked whether in his opinion the condition of the plaintiff, when he examined her, was such as might probably have been produced by an electric shock.

A witness who is qualified only as an expert as to the effects of electricity on the human body cannot testify as to whether a person can receive an electric shock from a wire which did not touch his person or clothing.

Plaintiff's evidence was that while walking in the street on which defendant's electric railway ran, the trolley of a car came off, and kept bumping against the span wires stretched across the street to hold up the trolley wire; that thereby a span wire was detached from its fastening to the pole, fell over the trolley wire, thus becoming charged with electricity; that there was a flash from the wire in plaintiff's face, and that she became unconscious and would have fallen but for help; that afterwards plaintiff developed certain symptoms of injury. It was shown that plaintiff might have received an electric shock through her clothing which would not have left a mark on her body. Defendant's evidence was to the effect that the wire did not touch plaintiff. *Held,* that the evidence is legally sufficient to show that either the plaintiff's person or clothing was touched by the wire, and to take the case to the jury.

*Held,* further that if the bumping of the trolley wire against the span wire caused the latter to be torn from the pole, that is some evidence that it was not properly fastened.

*Held,* further, that if the hysterical condition of the plaintiff was not caused by the accident there is evidence in the case that other injuries were caused by it for which she is entitled to recover.

In an action to recover damages for an injury alleged to have

been caused by defendant's negligence, a prayer is erroneous which instructs the jury that if they believe the accident happened as described by the witness, G. P., then the verdict must be for the defendant.

### Upon Motion for Re-Argument.

When objection is made to a question propounded to a medical witness which is overruled and the question answered, the admissibility of the evidence may be determined upon appeal not only upon a consideration of the character of the evidence, but also upon the ground that the witness was not shown to be qualified as an expert to answer the question, although no special objection was made at the trial that he was not competent to testify as an expert.

*Decided January 12th, 1909.*

*Opinion upon motion for re-argument, March 23rd, 1909.*

Appeal from the Court of Common Pleas of Baltimore City (HARLAN, C. J.), where there was a judgment on verdict for the plaintiff for $5,000.

*Plaintiff's 1st Prayer.*—The Court instructs the jury that it was the duty of the defendant to exercise reasonable care, in view of the danger to be reasonably apprehended from a failure to do so, in the construction and maintenance of its overhead wires and in the operation of its cars, in order to avoid injuring persons lawfully using the public streets; and if the jury find that one of the defendant's overhead wires broke and fell because of the failure of the defendant or its servant to exercise such reasonable care and that such wire was charged with electricity, and that it came in contact with the plaintiff's person or clothing and gave her an electric shock which rendered her unconscious and caused her serious injury, and that at the time the plaintiff was lawfully using a public street of Baltimore and was exercising reasonable

care, then the verdict of the jury should be for the plaintiff. (*Granted.*)

*Defendant's 4th Prayer.*—The jury are instructed that there is no evidence in this case legally sufficient to show that the wire mentioned in the testimony owned by and under the control of the defendant did, by and through the negligence and carelessness of the defendant's agents and servants, fall down in the way of the plaintiff at Howard and Lexington Streets, and therefore under the pleadings the verdict of the jury must be for the defendant. (*Refused.*)

*Defendant's 5th Prayer.*—That the uncontradicted evidence shows that the plaintiff was guilty of negligence directly contributing to the happening of the accident mentioned in the testimony, and therefore the verdict of the jury must be for the defendant. (*Refused.*)

*Defendant's 6th Prayer.*—The jury are instructed that if they believe from the evidence that the plaintiff could have avoided the happening of the accident by the use of ordinary care and caution on her part, then the verdict of the jury must be for the defendant. (*Granted.*)

*Defendant's 7th Prayer.*—The jury are instructed that there is no evidence in this case legally sufficient to show that the wire which fell as described in the plaintiff's testimony, at the corner of Howard and Lexington Streets, touched the plaintiff's person or clothing at all, and if the jury find that the plaintiff sustained no physical injury from said wire, but merely encountered peril, which caused fright and consequent mental suffering, then she is not entitled to recover, and their verdict must be for the defendant. (*Refused.*)

*Defendant's 8th Prayer.*—That the uncontradicted evidence shows that the defendant's agents and servants were not guilty of any act of negligence, either in the operation and management of the car mentioned in the testimony, or in the construction, maintenance or operation of the overhead wires at the point mentioned in the testimony, and therefore the verdict of the jury must be for the defendant. (*Refused.*)

*Defendant's 9th Prayer.*—The jury are instructed that the burden of proof is upon the plaintiff to show that the injuries complained of were caused by the want of ordinary care on the part of the agents and servants of the defendant company, and unless the jury shall be satisfied by the weight of the evidence that the injuries complained of were caused by the want of ordinary care on the part of defendant's agents, the plaintiff is not entitled to recover and the verdict of the jury must be for the defendant. (*Granted.*)

*Defendant's 10th Prayer.*—The burden of establishing by a preponderance of proof, satisfactory to the jury, the state of facts alleged in the declaration, rests upon the plaintiff; and if the testimony in this case should be such as to leave the minds of the jury in a state of even balance as to the truth of the facts alleged in the declaration, the verdict must be for the defendant. (*Refused.*)

*Defendant's 11th Prayer.*—That, even though they shall find from the evidence that there was a defect in the trolley pole or the overhead wires of the defendant company at the point of the accident, and if they shall further find that the injury was caused solely by such defect, still their verdict must be for the defendant, unless they shall find from the evidence that the defendant could have discovered the defect by a reasonable and proper examination and that the defendant failed to make such examination and that thereby injury was caused to the plaintiff. *Granted.*)

*Defendant's 12th Prayer.*—The jury are instructed that the law does not make the defendant company an insurer of the safety of pedestrians on the street, nor does it require the company to adopt every possible contrivance looking to their safety that human ingenuity can suggest, and that if they find from the evidence that the defendant had, in reference to both the erection and maintenance of the wires and equipment mentiond in the testimony, used every reasonable safeguard which the nature of its business admitted, then it has performed its whole duty in the premises, and under the plead

ings in this case the verdict must be for the defendant. (*Granted.*)

*Defendant's 16th Prayer.*—If the jury believe from the testimony that the hysterical condition described by the plaintiff and the plaintiff's witnesses in this case was not caused by the accident mentioned in the testimony, but was caused by other troubles from which the plaintiff was suffering prior to the time of the accident, then there is no evidence from which the jury can find that said accident caused any injury to the plaintiff, and the verdict of the jury must be for the defendant. (*Refused.*)

*Defendant's 17th Prayer.*—The jury are instructed that if the jury believe from the testimony in this case that the falling wire mentioned in the evidence did not strike the person or clothing of the plaintiff, and shall further find from the evidence that the plaintiff could not have received an electric shock, unless the said wire did come in contact with her person or clothing, and shall further find that if the plaintiff received no injuries whatsoever as the result of fright occasioned by the electric sparks mentioned in the testimony, then the plaintiff is not entitled to recover any damages as the consequence of the fright, and the verdict of the jury must be for the defendant. (*Granted.*)

*Defendant's 20th Prayer.*—If the jury believe that the plaintiff received no bodily injuries from contact with the electric current emanating from the broken wire mentioned in evidence, and that the flash and noise produced by such current so escaping from the broken wire would not have affected injuriously a person of ordinary physical and nervous strength in the position of the plaintiff at the time of the accident, then the plaintiff is not entitled to recover. (*Granted.*)

.The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE, and WORTHINGTON, JJ.

*Joseph C. France* and *J. Pembroke Thom* (with whom was *Albert R. Stuart* on the brief), for the appellant.

*S. S. Field* (with whom was *Philip M. Golden* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the appellee against the appellant for injuries alleged to have been sustained by her on Howard Street in the City of Baltimore, through the negligence of the defendant. The narr. alleges that by and through the negligence and carelessness of the defendant one of its wires, charged with electricity, "fell down in said plaintiff's way on said Howard Street from its elevated and proper position and came in contact with the plaintiff and gave her an electric shock, and while it was falling towards said plaintiff said wire was discharging great sparks of electricity, and as a result of the falling of said wire, as aforesaid, which was caused by the negligence of said defendant, its agents and servants, the said plaintiff was placed in a perilous position, and in her efforts to extricate herself from said dangerous position, and to get out of the path of said falling and electric light wire, the plaintiff was seriously and permanently injured and damaged to her nervous system and she was injured about her body and otherwise," etc. The wire which dropped into the street is what is called a span-wire and was stretched across the street to hold up the wire on which the trolley runs. It was in some way pulled out of the ring which holds it to the pole and it fell over the trolley wire, thereby becoming charged with electricity. The plaintiff contended that coming in contact with the wire caused the injuries, while the theory of the defendant was that so far as she sustained any injuries they were the result of fright and not from contact with the wire. The evidence on the part of the plaintiff was to the effect that she was left in a very serious nervous condition, became unconscious at times, suffered from convulsions, etc. Her physicians testified that she was suffering from "traumatic hysteria"— which was described by them to be hysteria produced by shock or injury, as distinguished from that caused by disease.

Ten exceptions were taken to the rulings of the Court on the evidence, and the eleventh embraces the rulings on the prayers. The Court granted the two prayers offered by the plaintiff, and the sixth, ninth, eleventh, twelfth, thirteenth, seventeenth, eighteenth, nineteenth and twentieth offered by defendant, and rejected its first, second, third, fourth, fifth, seventh, eighth, tenth, fourteenth, fifteenth and sixteenth, and overruled its special exception to the plaintiff's first.

The first, second and third exceptions can be considered together. Dr. Baum had testified that from the history of the case he had received he concluded that "the results of this case were the results of a shock." He was then asked: "When you say from your examination of the case you diagnosed it as traumatic hysteria or nervous condition produced by shock what kind of a shock do you mean?" To which he replied: "Well from the history I elicited it was rather an electric shock or fright." Perhaps the word "rather" in the record was intended to be "either." He was then asked: "Tell the jury whether or not her condition could have been produced by fright merely without receiving an electric shock, or by the electric shock, if you say it could have been produced by either; tell them which, in your judgment, was the most probable cause of it." That question was objected to, but the Court overruled the objection, and the witness answered: "It is probable for either to have caused it; it is possible for an electric shock to have caused it; it is my opinion that an electric shock would have caused her condition." That ruling is presented by the first exception.

His testimony then proceeded: "You have said either of them could; it is possible either of them could? A. Yes, sir. Q. Are you able to say as a physician, from her condition as you found it, which, in your judgment, probably caused her condition—shock from mere fright or electric shock?" The latter question was objected to, but, the objection being overruled, he answered: "I would say that the more probable was electric shock." That constituted the second exception; and immediately after that answer, the defendant made a

motion to strike it out, which the Court refused, and that ruling is embraced in the third bill of exceptions. It was said in *Williams* v. *State,* 64 Md. 384, that an expert "may give an opinion not only as to the nature and effect of an injury, but also the manner or instrument by which it was inflicted." In 17 *Cyc.,* 234, a great many illustrations are given of what medical experts are permitted to testify, amongst them "what he would judge was the cause of certain symptoms under given circumstances; which among several possible causes was the probable or approximate one." But while great latitude has been allowed in the examination of medical experts, they should not be permitted to express their opinions merely because they are physicians, but experts must be confined to subjects about which they are, or are presumed to be, acquainted. If a physician does not know more about the effect of a given cause than jurors or other people do, his opinion can be of no service in enabling the jury to reach a proper conclusion. This Court said in *Dashiell* v. *Griffith,* 84 Md. 377: "It is an unsafe practice in the admission of testimony to allow witnesses to speak as experts unless the Court is well satisfied that they possess the requisite qualifications; not alone on this account, but the effect of such testimony is most difficult to estimate, from the fact that undue importance not infrequently attaches to it and gives to it an influence upon the minds of a jury to which it is not fairly or reasonably entitled." A physician may be a very intelligent man, and may be very well versed in his profession, but that does not make him competent to speak as an expert of things he is not specially acquainted with.

In this case there was no evidence that the plaintiff was injured in her efforts to extricate herself from a perilous position, as alleged in the latter part of the above quotation from the narr., and the question raised by the pleadings and evidence was whether the wire "came in contact with the plaintiff and gave her an electric shock." Indeed, one of the prayers afterwards granted instructed the jury that if they believed the plaintiff received no bodily injury from contact

with the electric current emanating from the broken wire, but that her bodily injury and present condition were due to fright or nervous shock, caused by the flash or noise produced by said electric current, then the plaintiff was not entitled to recover, and the plaintiff's own prayer required the jury to find that the wire came in contact with her person or clothing and gave her an electric shock. The case as submitted to the jury was practically the same question asked Dr. Baum in the second bill of exceptions, excepting he was asked which of the two shocks probably caused her condition. Now if it be conceded that it is proper to ask a medical expert which of two possible causes was the probable or approximate one, surely he must be shown to have such knowledge of the effects of both as to be able to speak intelligently of them. This witness had not only not qualified himself as an electrical expert, or as a medical one acquainted with the effects of an electric current, but his cross-examination shows that he was not so qualified to speak. We will quote it: "Q. What kind of electric shock would she get if the wire did not touch her person? A. Apparently the wire might shock from fright; it is my opinion that it was the electric shock; whether there was contact was the question; I think you had better let some electrical expert explain that." Mr. Field: "You are not an electrical expert? A. No, sir. Q. You answer this was an electric shock; I did not know whether you meant a shock from electric current or fright produced by the electricity? A. I am unable to determine what the amount of the shock was received or anything of the sort. Q. If the testimony shows that there was no contact between the wire and the person would you still say this party was suffering from an electric shock? A. I am unable to answer that."

It is true that evidence was not in the record when the rulings on these exceptions were made, but it emphasizes the importance of seeing that a witness is qualified to speak as an expert before admitting his testimony. It shows that the opinion expressed by the witness was not founded on any special knowledge which qualified him as an expert. The theory

of the defense was that there was no contact between the wire and person, and yet the witness said he was unable to answer the question last above quoted. He had already said that the plaintiff's condition might have been caused by fright without receiving an electric shock, or by an electric shock, and although he is not an electric expert, and has not shown that he knew what effect on the body an electric current would have, if the wire did not come in contact with the person, he was permitted to testify: "I would say that the more probable was the electric shock." The answer to the question in the first bill of exceptions is not so objectionable as that in the second, for it only went to the extent of saying that it was probable that either fright or an electric shock might have caused her condition, but by the answer to the question in the second bill of exceptions he in effect said that an electric shock caused her condition. Again, the question *assumed* that either the shock from mere fright or an electric shock caused it, and was for that reason objectionable, as the defendant did not concede that it was caused by either, but on the contrary offered evidence tending to show other causes which were in part, at least, responsible for her condition. The question in the first exception was not altogether free from that objection, but the answer could not have done any particular harm, as we suppose that it cannot be denied that it was possible for an electric shock to have caused the condition of the plaintiff, but there was reversible error in allowing the question in the second bill of exceptions to be answered, and in not striking out the answer when the motion was made. The answer was not really responsive to the question, as the witness did not say whether he was able to say as a physician which probably caused her condition, but he proceeded to give his opinion.

We do not understand the fourth exception to be pressed. The fifth was to allowing the attending physician of the plaintiff to answer the question, "Whether or not a young woman in her condition is in a condition in which it would be proper for her to marry." The ground of the objection urged

is that the question did not state what condition was referred to, but on cross-examination he was asked what condition he did refer to, and replied: "I referred simply to her nervous condition, the condition of her nervous system." The appellant was not therefore injured by reason of the condition referred to not being more explicitly stated in the question. But regardless of that, a similar question was asked Dr. Wilson, the answer to which went before the jury without objection. While we do not think there was any reversible error in the ruling of the Court, such testimony ought not to be admitted, as such opinions of physicians must be more or less speculative or conjectural, if not misleading, when they are based entirely upon the nervous condition of parties.

The seventh exception was to the following question asked Dr. Baum: "Will you kindly tell the gentlemen of the jury what will be the ultimate effect of the condition from which the plaintiff is suffering, as you have testified, upon her mind?" to which he answered: "My opinion is that it will progress and that she will eventually lose her mind." That is objected to because Dr. Baum had laid no foundation as an alienist to give such testimony. In answer to that it may be said in the first place that he had been a practicing physician since 1895, is a graduate of the Baltimore Medical College, and was connected with the Maryland General Hospital for six years. He attended the plaintiff when she received the injuries complained of for four or five days; was then called in again on May 10th, saw her then and the next day, and her condition was such that he called in Dr. Wilson in consultation. He advised her to go to the country so as to avoid excitement, and did not see her again until a few days before the trial. There would seem to be no doubt under these circumstances he was competent to express his opinion as to her mental condition under the decisions in *Crockett* v. *Davis*, 81 Md. 134, and *Jones and Collins*, 94 Md. 403.

It cannot be doubted that there may be cases in which the opinions of physicians on such subjects may have undue weight. The opinion of a family physician of a juror will

naturally have more influence on him than that of some other physician whom he does not know, or does not have the same confidence in, and hence trial Courts ought to be careful to see that a physician so called upon to testify has either had the opportunity to form a correct opinion from his own knowledge of the person whose mental condition is being inquired into, or that it is based on all the facts in the case reflecting on the subject, which facts the Court should be satisfied are sufficient to enable him to form an intelligent opinion from. The weight of the testimony is for the jury, but its admissibility is for the Court to determine. But the law of this State does not require the physician to be an alienist—in the sense that he is a specialist in that line. If such were the law it would often deprive the jury of such aid as an honest and intelligent physician could give them in reaching a proper conclusion. It would greatly add to the expense of such trials, and would often deprive those of limited means of medical testimony, if no one but a specialist should be permitted to testify. As was said in *Crockett* v. *Davis,* on page 149 of 81 Md., in giving the reason why a physician can testify as to the mental condition of a testator, without first stating the facts and circumstnaces on which his opinion is based: "That is because he is presumed to have become, from special study and experience, familiar with the symptoms of mental diseases, and therefore qualified to assist the Court and jury in reaching a correct conclusion." There is an excellent discussion of the subject in 1 *Wigmore on Evidence,* sect. 687.

Nor do we find the form of this question objectionable, as it was based on the condition the witness had testified she was in, as found from his own attendance upon her, and examinations of her by himself and with Dr. Wilson. There is no error shown in that exception, but if there had been it would not have been reversible error (unless this Court could see that there was or may have been injury to the defendant, which does not appear in this case), for the same testimony was admitted without objection from Dr. Wilson. In regard

to the latter statement we deem it proper to say as affecting
a matter of practice, that if counsel wants the benefit of such
exception it would always be well to either object to the ad-
missibility of similar testimony or have it understood that it
is admitted subject to exception. When testimony has been
admitted and an exception noted, counsel may deem it neces-
sary to cross-examine the witness on the subject, and if it is
simply a cross-examination he ought not to be deprived of his
exception, provided the record shows he does not intend there-
by to waive it, and that ought to be inferred when it is strict-
ly cross-examination. There is perhaps some confusion in
the cases on this subject, but the rule ought not to be carried
to the extent of placing an attorney in the position that he
must either waive his exception or permit the evidence in
chief to stand without cross-examination. It is said in 2
*Ency. of Pl. and Pr.* 523, that a party cannot complain of the
action of the trial Court "that illegal or incompetent evidence
was admitted which was called out by his own counsel on
cross-examination of his opponent's witness, but when an
exception is duly taken to the admission of illegal evidence it
is not waived by cross-examining the witness with respect to
it." We think that is the correct rule, and any statement
in the opinions of this Court to the contrary must be modified
to that extent.

The seventh exception was taken to the ruling of the Court
in permitting Dr. Wilson to answer the question: "Will you
tell his Honor and the gentlemen of the jury whether or not
in your judgment the condition in which you found Miss
Corbin on May 11th was such that might naturally and prob-
ably have been produced by an electric shock?" Dr. Wilson
had testified that he had two electric shocks himself, and had
had three patients suffering from electric shocks. It is true
that the latter were shocks from lightning and not from elec-
tric wires, but we think that such experience as he had had,
taken in connection with his medical knowledge, was sufficient
to justify the Court in permitting him to answer the ques-
tion, which did not have in it the objection we have referred

to above in those asked Dr. Baum, but was merely whether the condition of the plaintiff "was such that might naturally and probably have been produced by an electric shock." It was held in *Block* v. *Milwaukee St. Ry. Co.,* 89 Wis. 371, that a physician could give his opinion that injuries might have been caused by contact with a wire charged with electricity, and as the theory of the plaintiff was that there was such contact, if the jury so found, it was proper to inform them whether her condition was such as might have been so caused. The question did not assume that there had been an electric shock. In *Davis* v. *State,* 38 Md. 15, a question was permitted to be asked a medical witness, "whether from the nature of the wound and fracture described as fatal by the examining physician, such wound and fracture could have been, or were likely to have been, inflicted by the accidental falling of the deceased into a sink, in the condition in which it had been described by the witnesses." See also *Seymour's Case,* 92 Md. 432, and authorities above cited.

The eighth exception was not pressed. The ninth was taken to the action of the Court in stopping a witness in his answer to a question. The answer was objectionable because it was mere argument, but at any rate later on he testified on the same subject, that it was impossible for the wire to have struck her, which was the question he was answering when interrupted.

We find no error in the ruling on the tenth exception. Dr. Bevan did qualify himself as to the effect of an electrical current upon the human body, and he was allowed to testify fully as to that, but the question was whether, assuming the facts stated, amongst others, that the wire did not touch the person or clothing of the plaintiff, she could have received an electric current from the wire. As to that, the doctor was no more competent to speak than any other intelligent witness. He did not profess to be an expert on electricity, excepting as to its effect on the human body. He in substance so stated in a subsequent part of his testimony, but there had

been no attempt to prove that he was, when the question objected to was asked.

This brings us to the last exception, which embraces the rulings on the prayers. The *first, second* and *seventh* prayers of the defendant and the special exception to the plaintiff's first prayer can be considered together. They present the question whether there was legally sufficient evidence to entitle the plaintiff to recover. The only difference between the first and second is that the latter refers to the pleadings, while the first does not. The seventh asked the Court to instruct the jury that there was no evidence legally sufficient to show that the wire touched the plaintiff's person or clothing at all, and the exception to the plaintiff's first prayer was on the ground that there was no evidence that the wire came in contact with the plaintiff and gave her an electric shock, and that there was no negligence on the part of the defendant.

There was certainly some evidence tending to show that the plaintiff received a shock of some kind, whether or not it was entirely the cause of her condition, as described by the doctors. There was also evidence by some of the defendant's witnesses that if the wire touched the clothing without touching the skin, it would have shocked the plaintiff if the clothing was in contact with the skin, and one of the defendant's experts, in answer to the question, "If the trolley struck her clothing would it have left any mark on her clothing?" replied: "No, sir; I can't say that it would," although he did say that if it struck the skin it would leave a mark. The context shows that he was speaking of the wire when he spoke of the "trolley." It was shown, therefore, that the plaintiff might have received an electric shock through her clothing without leaving any mark. The plaintiff testified that she was going west on the north side of Lexington Street, and when she reached Howard Street she saw a car on the opposite side, going south on the west track, and, to use her own words, as given in the record, "I kept on going, and the car started, and the trolley came off and kept bumping against

the wires; I did not pay any attention to that and walked on, and the car had gone far enough for me to pass behind it when I reached the track. When I was just about to reach the track *the wire came down into my face;* the wire came down, and there was such a flash right in front of my eyes— I took it to be so. I remember trying to run, but I don't know what happened after that." Again she said that "the flash was just like a great flash of fire; like lightning, only it was much larger than a lightning flash, covering witness's whole face." She could not say whether the wire touched her person or flesh, but if her testimony is correct as to the flash there is every reason to believe that it at least touched her clothing, for the testimony shows that there is no flash unless the wire comes in contact with something. A policeman testified that "he saw the wire that came down; that it was still hanging; that when it would strike anything it would throw a flash; when it was hanging loose it did not throw any." Several witnesses testified that she was about the east rail of the north-bound track on Howard Street when the flash came; she turned and was about to fall near the curb when she was caught. The wire was suspended about fifteen feet above the track, and when it broke from the pole, and hung over the trolley wire, it might readily swing backwards and forwards. One of the defendant's witnesses said the wire moved "three or four feet around" after it fell, and another of them said that the plaintiff was near the track, and about the time she threw up her hands he saw a flash at the back of the car—"right about at the trolley pole at the back of the car." Mr. Thiel testified that "he saw a flash from the trolley pole or trolley wire, and then the car started and went about six feet; it did not cross the curb; there was a slight noise, but not any more fire; then the car moved off again, and when the car moved off the second time witness saw some flashes about right back of the car, just about the same as if you light about two or three parlor matches, towards the west rail, towards the rail on the west side of the street." He also said he saw the wire afterwards, and "it was lying be-

tween the two tracks on the west side, just about the west side track of the south-bound car; it was lying in the track where the car had gone down." He said he did not see the plaintiff until she was about to the curb, that she seemed to faint and some gentleman caught her.

So, although the evidence of some of the witnesses contradicted her, if her statement is true she saw the trolley "bumping against the wires," and then walked on and the wire came down into her face when the car had gone far enough for her to pass behind it. She turned back toward the curb, would have fallen if someone had not caught her, and was unconscious for a considerable time. While jurors and others who are not electrical experts do not know a great deal about the effects of electricity, they do know some of them. Anyone might conclude from the testimony that she must have come in contact with a live wire to have produced the effects proven, if she had never had any nervous trouble before, as she swore she had not, and if her version of what occurred was true. Her statement was contradicted in some material respects, but if there was any evidence tending to establish her theory, as we think there was, the case should have gone to the jury, and therefore the first, second and seventh prayers of the defendant were properly rejected.

Nor are we of the opinion that there was no evidence of negligence on the part of the defendant. While the defendant has the right to use the public streets for its lawful purposes, great care should be required of it for the protection of those passing over them. If the span-wire was properly fastened to the pole, it would require great force to break it loose, and it certainly ought to have been so fastened as not to be liable to give way by any ordinary use of the trolley. If the bumping of the trolley against the wire resulted in causing this span-wire to be torn away from the pole, it was some evidence of negligence, and if such would not be the result if the span-wire was properly fastened, it would be some evidence that it was not properly fastened. This is not a case where the wire simply fell without any known cause, but it

fell after the trolley "kept bumping against the wires," according to the plaintiff. So without further discussing that branch of the case, we think the third, fourth and eighth prayers of the defendant were properly rejected and the special exception to the plaintiff's first prayer properly overruled.

Nor was there any error in rejecting the fifth, tenth and fourteenth. The fifteenth was properly rejected, if for no other reason because of its form. There are many cases, it is true, where certain specific facts are relied on and if believed by the jury would be sufficient to prevent recovery; but in this case, which apparently occupied several days, to instruct the jury that if they "believe the accident happened as described by the defendant's witness, Gilbert Porter, then the verdict of the jury must be for the defendant," would be an exceedingly dangerous practice to adopt. In the first place, if the jurors, or any of them, knew Mr. Porter and believed him to be a truthful man, they would hesitate to render a verdict for the plaintiff because they might regard the prayer as requiring them to pass on his veracity, and not simply on his recollection or opportunity to see and comprehend all that occurred. It would have the effect of bringing his testimony into more prominence than that of any other witness, and moreover the jury might not remember all of his testimony.

The sixteenth prayer was also properly rejected. Even if the hysterical condition of the plaintiff was not caused by the accident, it cannot be said that there was no evidence from which the jury could find that the accident caused her any injury. If she had never gone into the hysterical condition, which she claims followed the accident; if her theory as to how the accident occurred is correct, there was certainly some injury for which she could recover. To be so affected as to fall on the street, as she would have done if she had not been caught, and to remain unconscious for a considerable time, are injuries for which she could recover, if the hysterical condition had not followed.

The prayers that were granted for the defendant gave it the benefit of as much law on the subjects referred to in them

as it was entitled to, but for error in the rulings in the second and third exceptions the judgment must be reversed.

> *Judgment reversed and new trial awarded, the appellee to pay the costs, above and below.*

A motion for a re-argument was made, and in disposing of the same,

BOYD, C. J., delivered the opinion of the Court.

A motion for reargument has been made in this case, in the language of the brief in support of it, "chiefly on the ground that no objection was made below upon the ground that Dr. Baum was not qualified as an expert to answer the question," contained in the second bill of exceptions, "and that his qualification as an expert was therefore not open for review in this Court." As that point was not made at the oral argument or in the brief, but on the contrary the admissibility of the question was discussed, our attention was not directed to it and hence we did not refer to it in the original opinion. But without meaning to intimate that the rule which has been adopted in some jurisdictions should have the wide scope given it which is contended for by the appellee, even if it be conceded to be a general rule it cannot be applied in this case.

We recognized Dr. Baum as a medical expert in passing on several of the exceptions, and have no doubt as to his competency to testify *as such*, but that did not authorize him either to make conjectures or to express an opinion on a subject which required information that he confesedly did not have. The case, as tried below, depended largely upon whether the plaintiff had received an electric shock by coming in contact with a live wire, or whether her condition was the result of fright, without contact with the wire. Dr. Baum had testified that (quoting from the record): "From the history he learned of the case he concluded that the results of this case was the result of a shock," and upon being asked what kind of a shock he meant, he said: "Well, from the

history I elicited it was *rather* an electric shock or fright."
He probably used the word "either" instead of "rather,"
which is in the record, for the next question was: "Tell the
jury whether or not her condition could have been produced by
fright merely without receiving an electric shock, or by the
electric shock, if you say it could have been produced by either
tell them which, in your judgment, was the most probable
cause of it?" His reply to that was: "It is probable for
either to have caused it; it is possible for an electric shock
to have caused it; it is my opinion that an electric shock could
have caused her condition." Then he was asked: "You have
said either of them could; it is possible either of them could,"
and replied: "Yes, sir." Then came the question in con-
troversy, which was: "Are you able to say as a physician,
form her condition as you found it, which, in your judgment,
probably caused her condition—shock from mere fright or
electric shock?" The question was objected to but the objec-
tion was overruled, and he answered: "I would say that the
more probable was electric shock." A motion was at once
made to strike out that answer, but it was overruled.

Even from the present standpoint of the appellee, there
ought not to be any serious doubt that the motion should have
prevailed, and perhaps would have been granted if the learned
Judge below had observed that it was not an answer to the
question. Dr. Baum did not answer the question, "Are you
able to say *as a physician,*" etc., and has never said that
merely as a physician he could answer that question, but he
proceeded at once to give his opinion. He was not asked
whether he could say as an electrical expert, or from the
history of the case, or from any standpoint other than as a
physician, which of the two causes probably produced her
condition. Yet we are told that the appellant cannot have
the benefit of its objection to the question, because it was not
specially made on the ground that he was not a competent wit-
ness to testify as an expert. He was, as we have seen, admit-
tedly a medical expert, and he was asked whether he could
"say as a physician," etc. If the question had been otherwise

unobjectionable, it would have been difficult to have excluded it on the mere ground that he was not an expert, because he was the kind of expert the question referred to.   If he had first answered the question that was asked him, in the affirmative, he could have then been further questioned as to his knowledge as a physician of the effects of an electrical current, etc., and then the defendant could, and probably would, have objected on the ground that he was not competent to testify as an expert on the subject involved in the question, for he subsequently admitted on cross-examination that he was not an electrical expert and was unable to say whether the plaintiff could suffer from an electric shock if there was not contact between the wire and the person.   It would, therefore, be carrying the rule contended for further than any authorities we are aware of have gone, and certainly further than we are willing to go, to say that the question cannot now be raised because the record does not show that the objection was specially made on the ground that the witness was not competent as an expert, notwithstanding the facts above referred to.

But in addition to what we have said, we are of the opinion that there was error in allowing the question to be asked, and such error as we clearly had the right to review.   We cannot read the testimony of Dr. Baum without reaching the conclusion that his answer was nothing more than a conjecture—a pure guess—and furthermore it was based on the history of the case he had received from the plaintiff, or in some way outside of the record.   If the condition of the plaintiff might have been the result of either of the two causes spoken of—fright or actual contact with the wire—as he swore it might have been, it was impossible for him to know any better than the jury which of the two caused it, unless there were some marks, or something to distinguish between the two, which he did not pretend was the case.   In justice to the doctor we must assume, what his testimony as recorded seems to clearly indicate, that he was influenced by the history of the case as he had gathered it, which undoubtedly was

not permissible. If he had been sufficiently versed in the effects of electric currents, a hypothetical question might have been so framed as to elicit an answer that would have been admissible, but to permit him to answer the question under the circumstances we have related, was simply allowing him to decide the very question that the jury had to determine, without being better qualified than they were to do so. We do not mean to say there may not be cases in which an expert can say which of two causes may be the most probable, but this is not such a case, if we are to be governed by what is in the record. Dr. Baum did not pretend to be an electrical expert but testified that he was not, but if we could assume that he was, or if we conceded that that question cannot be reviewed by us, he did not suggest that there was anything, unless it be the history of the case, which enabled him to distinguish between the two causes, either of which he said could probably have produced the condition he found the plaintiff in.

So without referring to other questions, we must overrule the motion for a re-argument.

*Motion for re-argument overruled.*