THE MAYOR and CITY COUNCIL OF CUMBERLAND *vs.* ARTHUR F. LOTTIG, Infant, by Next Friend, Etc.

*Negligence—Injury to Boy on Roof of House From Electric Light Wire—Contributory Negligence—Imputation of Negligence to Infant.*

Plaintiff, a boy six years of age, was taken by his mother to the roof of their house at night to look into an adjoining theatre. Defendant's electric light wire ran about eighteen inches from the cornice. When some of the persons there present touched this wire plaintiff's mother warned them of the danger of doing so. The wire was brought within reach of the plaintiff, who touched it at an exposed point and was severely burned. The wire was in the same position when plaintiff's family moved into the house. In an action to recover damages, *Held*, that whether the defendant was negligent or not in maintaining the wire at a place where persons were not likely to come in contact with it at a time when charged, yet the plaintiff's contributory negligence in touching the wire is such as to bar a recovery, if he was old enough to know better ; and if he was too young to know the dangerous nature of the wire, then his mother's negligence in taking him to a place of danger must be imputed to him.

Appeal from a judgment of the Circuit Court for Washington County (STAKE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Albert A. Doub* (with whom were *James A. McHenry* and *Daniel W. Doub* on the brief), for the appellant.

*R. T. Semmes*, (with whom was *John G. Wilson* on the brief), for the appellee.

FOWLER, J., delivered the opinion of the Court.

This is an action to recover damages for injury resulting from contact with an electric wire which was maintained by the city of Cumberland along and over the cornice of the roof of a house in that city occupied by the mother of the plaintiff. There was a verdict in favor of the plaintiff for $4,000 and the defendant has appealed,

The questions to be considered arise on exceptions to the rulings on instructions given the jury and also on an exception taken by the defendant to the remarks of the learned Judge below while delivering an oral opinion upon the prayers which counsel for the respective parties had submitted for his consideration.

It appears from the evidence in the case that the plaintiff is a lad six or eight years old and that he lived with his mother and step-father in the city of Cumberland, on the south side of Little Frederick street, opposite the south side of the City Hall, the second story of which was used as a theatre or so-called "Academy of Music." On the night the plaintiff was injured his mother borrowed a step-ladder from a neighbor and by means of it she was able to reach "the trap-door" in the roof, and in this way she got out upon the roof taking with her the plaintiff. Several persons had preceded the plaintiff and his mother, all having reached the roof by the same means of egress. It appears from the evidence that they all, seven in number, the plaintiff and his mother included, went upon the roof for the purpose of looking into and through the windows of the theatre to witness the play or burlesque which was being given there that night. Mrs. Mansfield, the mother of the plaintiff testified as follows :

" I live in Cumberland on the south side of Little Frederick street, which separates my house from the City Hall building, in a rented house. It is a two-story house and the roof can only be reached by a step-ladder. The roof is not perfectly flat but slants very little and is covered with tin, and is connected with the ground by a sheet iron pipe. The injury occurred on the 25th day of August, 1898, between 8 and 9 o'clock at night. It was not a very dark night, but I do not think it was moonlight. There was an arc light in front of the house on a pole, but could not say how close to the house. One wire was across the top of the house and another along the house. The one across the top of the house extended between two poles and was high enough above the roof for the boy to reach it lying on his stomach. I was sitting on a chair and he was lying in front at my feet. There was a rug and a carpet between me and the roof. There was seven in all present. The girls went up ahead of me and Arthur wanted to go and he would not go unless I did. They took a chair up and some carpet with them. The chair was for me to sit on. I was hardly seated until the girls reached out and touched the wire. I told them not to touch them as we did not know what they were and just then he touched it. I hardly had the words out of my mouth and I knew what it was. I grabbed him and the wire flew from his hands. If I had not been there nothing would *of* saved him, because the balance all run. There *was* flames and he was burned on the left hand, right elbow and both knees, and his body on his right arm was burned through the jacket. I was looking at the play in the Academy of Music from the roof. This was in August, in warm weather. The Academy of Music is on the second floor, on the level with the top of our house. It was the night the Academy was opened and the show was a burlesque. I was not there long enough *there* to see anything, because just as I got there the boy was burned. The girls were looking at the play. They were there first. I took Arthur up with me as well as the other one. We climbed up the step-ladder and went right up and across the roof. I was

a good deal farther back than they were. They were at my feet lying down. I borrowed the step-ladder that evening from Mr. Brown, and my daughter brought it up there. I have lived in the property since last April, one year ago, and for fifteen years before I lived across the street. I lived altogether up stairs. There is four rooms and a kitchen in the house. The porch is part of our house. I had never been up there before, but the girls took Arthur up there before without me. *The wires were there before we moved in, and there never was a wire put there after we moved in.* We had only been in then from spring until in August when the accident happened. As I went up I took the boy with me, and as I sat down Miss Peterman touched the wire and I told her not to touch the wire, because we did not know what it was. Just then he took hold of it, and as he took hold of it I knew what was wrong right away from the flashes that flew. The minute I saw it I ran and grabbed him. The flashes were terrible. It brightened up everything around it. The flame was three or four feet from the edge of the roof where this boy was lying. The girls *was* closer to the edge of the roof. The boys were further back. The wire was over his head. It was as far up as he could reach. I was at his feet. They were lying on rugs and carpets. As the girls let go Arthur touched it ; whether they pulled it down I could not say. As I spoke of it he took hold of the part that was not covered. I did not know the wire was there until I went up there. *I knew the wires were dangerous and told them that.*"

John Mansfield, the step-father of plaintiff testified that he looked at the wire next morning after the accident, that it was about 18 inches off the roof before the defendant caused it to be raised ; that it was about four feet inside the edge of the roof, but afterwards said he judged it might be about 18 inches from that point. This witness was inside the theatre looking at the play and therefore saw nothing of the accident.

Martin Murphy, another witness for the plaintiff and related to his mother by marriage, testified that he was a lineman and was engaged in putting up electric wires, &c.; that he went

upon the roof to examine the wire ; but the view we have formed by the case makes it unnecessary to consider his or any of the other testimony not relating directly to the accident itself. Mrs. Mansfield and the plaintiff are the only witnesses in the case whose testimony describes the accident. The testimony of the latter is very brief. It is as follows : "I remember the night I was on the roof and the hurt. I am six years old  *  *  *  I was lying on the roof, on my stomach. I touched the wire with my left hand and I don't remember anything after that. It burned me."  *  *  * We are all of opinion that this is a clear case of contributory negligence, and hence we are of opinion that the defendant's first prayer asking the Court to take the case from the jury should have been granted. It appears, from the testimony we have above recited that Mrs. Mansfield was living in the house in question as a tenant, and that the wire was in the same position when the accident happened that it was when she moved into the house and just where it had always been. It did not run across the roof, but it was located from three or four feet to eighteen inches from the outer edge of the cornice. The roof was not intended, nor had it ever been used for any such purpose as the plaintiff and his mother and their friends were using it. The question as to whether Mrs. Mansfield and her son were rightfully or wrongfully on the roof is a matter of little consequence in this case, for even if it could be conceded they were using the roof for a purpose for which it was intended, yet in our opinion the evidence shows a reckless disregard of danger and that, too, of a danger which was fully appreciated. She knew the wires were dangerous and so told her friends. But whether she knew it or not, she was bound to know it. It is too late now when everybody must be presumed to know the danger of handling electric wires to say that anyone in his right mind can be exculpated from the charge of reckless carelessness who would act as Mrs. Mansfield acted according to her own testimony. She either saw or could have seen the wires in time to have avoided placing, or allowing her child to lie down immedi-

ately under the wire. According to her own testimony her friend or friends on the roof with her reached *out* and touched the wire and her son was near enough to imitate their foolish example.

Of course we have not considered the question of negligence *vel non* on the part of the defendant for that is conceded by its defense of the plaintiff's contributory negligence. In other words the position of the defendant is substantially this : "We deny we are guilty of negligence because one of our wires running along the edge of the cornice of your house happened to be defective, without our knowledge, at a point where we had no reason to believe you would ever go, especially at night to look at a play across the street, but if we were negligent, your own rashness is the proximate cause of your injury." The plaintiff cited and relied upon *Western Union Tel. Co.* v. *Nelson*, 82 Md. 293, and *Brown* v. *The Edison Electric Co.*, 90 Md. 400. In the case first cited this Court said : "Now the deceased at the time of the injury was upon a public highway at a spot where he had a right to be and was going along it to his home in a lawful and proper manner. The sidewalks of the city are for the use of all persons who have occasion to pass along them, and while in the exercise of this unquestioned right are entitled to be protected and safe from all injury on account of dangerous obstructions." And in *Brown's case, supra*, the facts were entirely different from those we have here. In that case it appeared that a boy eleven years old was sent upon a roof covering the front window of the store about three feet wide which extended across the entire front of the building just below the second story window. An open rain-spout or gutter ran along the front edge of this roof and discharged its contents by a down-spout attached to the front of the building. The boy was directed by his employer to go upon the roof which covered the store window to clean it and the rain-spout, and while thus engaged he came in contact with an ·electric wire and was injured. This Court said it was error to have taken this case from the jury—and that outside of any contractual relations between

the parties to the suit the very nature of the business thus conducted by the Electric Company imposed upon it a legal duty to see that its wires when strung where *persons were liable to come in contact with them* were properly placed and insulated with reference to the safety *of such persons*—and that this was especially so in reference to a person who in the exercise of *a lawful occupation in a place where he had a legal right to be*, was liable to be injured by contact with the wires. But these are very different cases from the one at bar. The defendant, as we have seen never had any notice that the roof was going to be used in the manner and for the purpose for which it was used. Can it be said that the plaintiff and his mother, as was said of Nelson in *W. U. Tel. Co.* v. *Nelson, supra*, were upon a public highway or in a place the defendant supposed they would ever go, or that they were acting in a proper manner? Of course, if the plaintiff or a workman had gone upon the roof in *the daytime* to do some necessary and proper work, a different case would have been presented. As was pointed out, however, the wires were harmless during the day and no injury could have possibly happened to anyone working there during the usual hours. It certainly needs no authority to show that it is not proper to get on one's housetop and lie down in dangerous proximity to the edge of the cornice only a few few feet below electric wires. Such conduct may not be a breach of the law, but clearly it was a most glaring act of negligence. Nor do we see how the views expressed by this Court in *Brown's case, supra*, can possibly support the contention of the plaintiff in this case.

The evidence of the infant plaintiff's mother showing, as we have said, that she recklessly and carelessly took him into a place of danger, there can be no recovery; because if he was too young to know of the dangerous character of the wire his mother's negligence must be imputed to him, and if he was old enough to know better than to take hold of the wire his own negligence would be fatal to his case.

In conclusion a word in regard to the remaining exception —that relating to the comments or oral opinion of the trial Judge in the presence of the jury.

Having disposed of the case by what we have already said we do not deem it necessary to pass upon all the criticisms made upon the oral opinion delivered below. It is reproduced in the record, and we assume it to be correctly reported. We think the trial Judge was in error when he told the jury that the right of the plaintiff to recover was not at all dependent upon how the roof was used by him and his mother; "that they might use it for any purpose, for even an unlawful or immoral purpose" and that their right to use it *for any purpose* cannot be questioned in this case." From what we have already said it will be seen we do not agree with those views. Again the trial Judge told the jury there was no evidence that the wire was pulled in. But Dr. Carpenter testified that Mrs. Mansfield told him that if she had not got hold of the child the wire would have dragged him off the roof, and that he could not have reached the wire if somebody had not pulled it to him. Marcellus Martin says Mrs. Mansfield stated that she did not see why in the world the rest did not get shocked, because they pulled down the wire to the boy—otherwise he could not have reached it. There is other evidence in the record tending to prove the same point but what we have quoted is sufficient for the present purpose. It is difficult, we know, for the Judge to remember all the evidence upon every disputed question of fact, and it is for this reason, that the trial Judge should be extremely cautious to avoid commenting upon the weight or the failure of evidence. In the recent case of *Coffin* v. *Brown*, 94 Md. 190, we said, Boyd, J. delivering the opinion : "We are aware that it is sometimes difficult for the Court to assign reasons for its rulings without saying something that may unintentionally affect the jury. But if a Judge makes a statement which shows his opinion of a question of fact which the jury is to pass on, it is very apt to make an impression on some, if not all, of the jurors and great care should be exercised to avoid it."

It follows that the judgment will be reversed.

*Judgment reversed without a new trial.*

(Decided April 1st, 1902.)