Patricia Ann **ZACCARI**, Infant, by Charles Zaccari, her father and next friend, and Charles Zaccari

v.

**UNITED STATES of America.**

**Civ. No. 7971.**

United States District Court
D. Maryland, Civil Division.

Oct. 5, 1956.

M. King Hill, Jr., and Eugene A. Alexander, III, Baltimore, Md., for plaintiffs.

Walter E. Black, Jr., U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., arises out of a collision between an automobile driven by Charles Andrew Ries, an employee of the government, on government business, and an automobile driven by the plaintiff Charles Zaccari, in which his daughter, the infant plaintiff Patricia Ann Zaccari, 6½ years old at the time of the accident, was a passenger. The issues are: (1) whether the collision was caused by negligence on the part of Zaccari, or of Ries, or of both; (2) whether the claim of the infant plaintiff against the United States is barred by her father's negligence; and (3) the amount of damages to which the child is entitled for her serious facial disfigurement.

The collision occurred about 10:00 A.M. on Sunday, December 21, 1952, at the intersection of Hillenwood Road and Willowton Avenue, in northeast Baltimore. Zaccari was driving east on Hillenwood, Ries north on Willowton. Both streets are 30 feet wide from curb to curb; both have grass plots between the sidewalks and the curbs. There are rows of houses on both sides of Hillenwood, with front lawns. No houses face on Willowton south of Hillenwood, but the corner houses on Hillenwood have side lawns. At the time of the accident cars were parked solidly on both sides of Hillenwood, but not on Willowton. Hillenwood has a gradual curve to the right approaching Willowton from the west. There was no traffic light or other traffic signal at the intersection. The ordinary right of way rules applied.

Zaccari was driving his two-door Ford sedan, with his wife in front, Patricia in the right rear, and another child in the left rear. He was driving at a reasonable rate of speed, he says about 20 m. p. h., because of the cars parked on both sides of the street, and because he was following an unfamiliar route. When he was about 10 to 12 feet west of Willowton he slowed down, he says to 10 m. p. h., looked right, and saw the Ries car coming north on Willowton. Both Mr. and Mrs. Zaccari testified that the Ries car was then about at an alley, 150 feet south of Hillenwood. I find from all of the evidence, however, that the Ries car was only about 75 feet south of Hillenwood at that time. Zaccari proceeded across the intersection, gradually increasing his speed, he says to about 17 m. p. h. He was past the midline of Willowton before he and his wife realized that Ries was not going to stop. It was then too late to do anything to avoid a collision, and when the front of the Zaccari car had just about reached the east curb line, the front of the Ries car struck the right side of the Zaccari car, severely damaging the right door and the right side of the car where Patricia was sitting. She was badly cut on the right side of her face by shattered glass. The Zaccari car came to rest on the northeast corner, with its rear to the corner house and its front facing generally south.

Ries was driving his own Ford automobile, which he had rented to the Post Office Department for the Christmas rush. He was a substitute carrier, and was delivering bundles of mail from the Hamilton branch to the various mail boxes, to be picked up by special substitute carriers. He had just made such a delivery at Willowton and Northbourne, one block south of Hillenwood. He testified that in driving north on Willowton from Northbourne to Hillenwood he did not exceed 15 m. p. h., but I find from the damage to the Zaccari car and all the other evidence that Ries approached Hillenwood at about 30 m. p. h. He looked

to his right when he was about 40 feet south of Hillenwood, but he admits that he did not look to his left until he was about 15 feet south of the intersection, too late, in view of the minimum reaction time, to make any application of his brakes effective until his car was well out into the intersection. There were no skid marks from either car before the impact. Beyond the point of impact there were rub marks on the street where the Zaccari car swung around. The Ries car stopped a few feet north and east of the point of impact. Ries intended and attempted to turn to the right immediately before the collision and Zaccari intended and attempted to turn to the left, but the time was too short to permit either car to make any appreciable turn.

█ █  Ries was clearly guilty of negligence causing or contributing to the collision, in view of his speed and his delay in looking to the left. The Zaccari car was in the intersection at a time when Ries, if he had been exercising ordinary care, should have been able to stop. The Maryland Court of Appeals has repeatedly stated that a favored driver does not have the right to proceed across an intersection under all circumstances. Taxicab Co. v. Ottenritter, 151 Md. 525, 135 A. 587; Wlodkowski v. Yerkaitis, 190 Md. 128, 57 A.2d 792; Legum v. Hough, 192 Md. 1, 63 A.2d 316; Rabinovitz v. Kilner, 206 Md. 455, 112 A.2d 483.

Whether Zaccari was negligent is a closer question, but I find as a fact that he was. He saw the Ries car approaching the intersection and saw or should have seen that it was not coming slowly. Zaccari says that he had slowed down to 10 m. p. h., yet he undertook to enter the intersection when the Ries car was not more than 75 feet away, and he did not look to the right again until he was more than half way across the intersection. See Askin v. Long, 176 Md. 545, 6 A.2d 246; Bush v. Mohrlein, 191 Md. 418, 62 A.2d 301; Rabinovitz v. Kilner, 206 Md. 455, 112 A.2d 483.

Zaccari's negligence bars his own claim for loss of his daughter's services and for the medical expenses to which he has been and will be subjected for her treatment.

█  Whether or not the father's negligence bars the daughter's claim depends, of course, upon the Maryland law. Chapter 78 of the Acts of 1956, effective June 1, 1956, codified as Article 75, sec. 3A, of the Annotated Code of Maryland, provides: "In all actions to recover damages, for death, or injury to the person or property of an infant, by or on behalf of an infant, the negligence of the parent or other custodian of the infant shall not be imputed to the infant from the fact of such parenthood or custodianship." That statute, however, must be applied prospectively, and does not control in this case. State to Use of Maines v. A/S Nye Kristianborg, D.C.Md., 84 F.Supp. 775, Chesnut, J., and Maryland cases cited therein. Before the Act of 1956, the Maryland rule turned on the question whether the infant was old enough to be required to exercise care for his own safety, although, of course, a child was and is to be held only to such degree of care as ought to be reasonably expected from children of his age and intelligence. Baltimore City Passenger Railway Co. v. McDonnell, 43 Md. 534. "If the child be so young as not to be able to take care of itself, then parental neglect, resulting in injury, may be imputed to the child." United Railways & Electric Co. v. Carneal, 110 Md. 211, 72 A. 771; Caroline County Com'rs v. Beulah, 153 Md. 221, 138 A. 25; Graham v. Western Maryland Dairy, 198 Md. 210, 81 A.2d 457, 459.

In Cumberland v. Lottig, 95 Md. 42, 51 A. 841, a boy, 6 years of age, was taken by his mother to the roof of their house at night to look into an adjoining theatre. He touched an exposed portion of an electric wire which ran across the roof, and was severely burned. The court said, 95 Md. at page 48, 51 A. at page 843: " * * * if he was too young to know of the dangerous character of the wire, his mother's negligence must be imputed to him, and, if he was old enough to know better than to take hold of the

wire, his own negligence would be fatal to his case."

■ In Maryland the turning point has generally been considered to be about 6 years of age, when the child is in the first grade and has been or should have been taught some elementary safety rules. The infant plaintiff in the case at bar was 6½ years old at the time of the accident, was in the first grade at the Northwood school, and had attended kindergarten. She was therefore old enough to be bound by her own contributory negligence, if any, and her father's negligence is not to be imputed to her. The government does not contend that she was guilty of any contributory negligence herself.

■ Patricia sustained a deep laceration with partial avulsion of her right cheek and upper lip, the laceration extending into the floor of the nose, a laceration of some of the muscles of the mouth and cheek, a small laceration of the forehead, and partial paralysis of the seventh nerve. She has had three operations, one on the day of the accident, one in 1953, and one in 1955. Surgical and hospital bills to date have amounted to $325 and $242 respectively. At the present time she has a "U" shaped scar about 8 cm. in length, extending from the mid portion of the nose out to the center of the cheek and then back to the corner of the mouth. This has been converted to a zigzag scar at the corner of the mouth in order to avoid contraction. There is an obvious obliteration of the right nasal labial fold, some distortion of the right nares and drooping of the right upper corner of the mouth. There is an inability to raise completely the right upper corner of the lip in attempting to smile. The palsy of the seventh nerve has gradually subsided, but there remains a fullness and drooping of the right cheek and nostril. All of the doctors are agreed that this condition can be relieved in whole or in part by further surgery, but all are agreed that some extensive scarring will remain. There is no certainty that the swelling and sagging of the cheek and the distortion of the nares and corner of the mouth can be completely eliminated. Further medical, surgical and hospital expenses would cost at least $500 and might amount to substantially more than that over the plaintiff's lifetime.

The disfigurement, which was greater in the earlier years than it is today, caused and causes the child some embarrassment, especially when joining new groups of children as a result of changing scools, etc. It will be a handicap to her throughout her life.

On the first cause of action, the claim of Patricia Ann Zaccari, infant, I direct the Clerk to enter judgment in favor of the plaintiff in the amount of $16,000. On the second cause of action, the claim of Charles Zaccari, I direct the Clerk to enter judgment in favor of the defendant.