**Willie A. HARRIS and Anita Harris**

v.

**The POTOMAC EDISON COMPANY, a body corporate, Defendant and Third-Party Plaintiff,**

v.

**Lawrence W. LYNCH, individually and doing business as Lawrence W. Lynch, Builder, Third-Party Defendant.**

**Civ. No. 18509.**

United States District Court
D. Maryland.

Sept. 11, 1969.

---

Gerald Herz, Lesser & Lesser, Washington, D. C., for plaintiffs.

Herbert F. Murray, Smith, Somerville & Case, Baltimore, Md., for defendant The Potomac Edison Co.

Lawrence W. Lynch, third-party defendant, in pro. per.

THOMSEN, Chief Judge.

This action for personal injuries against Potomac Edison Company by a bricklayer who came in contact with one of defendant's power lines while constructing a chimney on a new house, has been tried before the Court without a jury.*

In 1932 Potomac Edison Company (defendant) obtained a right of way easement for the erection of poles carrying electrical power lines over a field in what is now known as the Oakridge Subdivision in Montgomery County, Maryland. At the time of the accident in July 1965, the poles carried distribution lines serving farms and residences in the area. The lines consisted of three horizontally level hot lines and one neutral line running below. The hot lines transmitted 12,470 volts phase-to-phase and 7,200 volts phase-to-ground: they were 25 ft. above ground at the poles and 22 ft. above the ground at midspan.

Sometime before April 1965, Lawrence W. Lynch, a builder, bought several lots in Block B and lots 2, 3 and 4 in Block A of the subdivision. Lot 1 in Block A was owned by a man named Price. It lay generally north of lot 2; lot 2 was north of lot 3; lot 3 was north of lot 4, and all Block A lots were north of the lots in Block B. The power lines ran generally from north to south over the middle of lots 1 to 4 in Block A.

In April 1964, Lynch got in touch with Patrick L. McLaughlin, defendant's engineering technician responsible for the design and layout of the distributions lines. It is the policy of defendant to relocate its lines as an accommodation when new construction makes such relocation necessary or desirable, so McLaughlin promptly came to the site and discussed with Lynch the relationship of the lines to the proposed houses. He asked Lynch to send him a sketch showing the exact locations of the houses.

Lynch began his foundation work in early May and sent McLaughlin the sketch which McLaughlin had requested. McLaughlin visited the site again before the middle of May, when it was evident that the lines ran at a slight diagonal over the proposed house on lot 3 and near the house on lot 4. McLaughlin warned Lynch of the high voltage carried by the wires and agreed to relocate the wires upon obtaining proper consents. Lynch told McLaughlin that there was no great hurry, because he was beginning with the houses in Block B and would not reach lot 3 in Block A for some time.

* Willie Harris, the original plaintiff, will be referred to herein as "plaintiff".

One of the poles was located on lot 2; the nearest poles to the north and south, respectively, were north of lot 1 and south of lot 4. McLaughlin proposed to relocate the pole north of lot 1, as well as the pole on lot 2, in order to carry the lines nearer the road in front of the lots and away from the house on lot 3. This proposed relocation required the consent of Price (the owner of lot 1) as well as of Lynch. Price delayed visiting the site to examine the proposed relocation and delayed committing himself one way or the other with respect thereto; so McLaughlin was eventually forced to develop a second proposed relocation which did not change the location of the lines over lot 1 and, therefore, did not require Price's consent.

Meanwhile, on June 11, while it was still hoped that Price would consent, McLaughlin had sent a consent form to be executed by Lynch et ux. The Lynches signed the form on June 15, but they neglected to have it witnessed and delayed some days sending it to McLaughlin. Before it was received, McLaughlin had prepared the second proposed relocation, and he obtained a proper consent of the Lynches thereto at their home near the end of June when he delivered the consent form for witnessing.

The first proposed relocation of the poles had been staked out in May. McLaughlin staked out the second proposed relocation late in June, and sent the plan to the construction department on or just before Friday, July 16. Lynch never urged prompter action by defendant in relocating the poles.

Lynch had contracted with Charles Sauer, Jr., a bricklaying contractor, to lay the brick facing on the houses in this development. Sauer brought his men to the Oakridge site from another job, leaving behind the plaintiff, who specialized in laying chimneys. Sauer's men started work in Block B and worked north, reaching the house on lot 3 in Block A on July 19.

The brick work, aside from the chimneys, consisted essentially of laying four brick walls around a wooden box to a height 16 ft. from the ground. Above this box other men were to place a peaked roof with a triangular wooden section over the brick wall at each end. Sauer was to construct a chimney at each end about 7 ft. above the 16 ft. wall.

Lynch had not regraded the lots to any appreciable extent, and the height of the wires above the ground—25 ft. at the pole on lot 2, and 22 ft. at the mid-span above the location of the house on lot 3—was not changed.

On Monday, July 19, the job was referred to Russell Rinehart, one of defendant's general construction foremen. He arrived at the construction site early in the morning of July 20 to "scout" the job to determine the number of men and the amount of equipment needed. Sauer's men had started work on the house on lot 3 the day before, but had not laid any bricks above the level of the main floor, 8 ft. above the ground. The scaffolding, in sections each about 4 ft. high, had been raised to a height of about 8 ft. so that Sauer's men could lay bricks above the 8 ft. level. They planned to complete the 16 ft. high brick wall on the morning of July 20, after an additional 4 ft. of scaffolding had been put in place. Neither Lynch nor Sauer was there, so Rinehart warned the men present that it was dangerous to lay bricks so near the hot wires. Sauer's men said that they knew the wires were hot, but that they were going to stop at the 16 ft. level, and that the wires (which were at least 22 ft. from the ground) would not bother them, because they were standing on scaffolding only about 12 ft. high. Nevertheless, Rinehart, realizing that the situation was potentially dangerous, stayed at the site until about 11:30 a. m., when Sauer's men had completed the 16 ft. walls, and had moved over to the house on lot 2.

The following day, July 21, Rinehart filed his scouting report and arranged for the poles to be relocated "as soon as possible". The poles were relocated on July 22, the day after the accident.

On the morning of July 20 plaintiff was completing the chimney on a house in another development. He came to the Oakridge site after lunch, missed Rinehart's visit, and worked with Sauer's other men on the basement of the house on lot 2. On the morning of July 21 Sauer came to the job site and directed plaintiff to work on the chimneys of the house on lot 3. The scaffolding had been built up to a height of a little more than 16 ft. Standing thereon to lay the chimney, plaintiff would be very close to one of the three hot lines. He asked Sauer whether it was safe. The evidence as to what then transpired is conflicting. On the weight of the credible evidence, the Court finds that Sauer, or one of his employees under his direction, stood on the scaffolding and used a 2 by 4 board, 8 or 10 ft. long, to push the wire up and out, away from the place where plaintiff would be working. One end of the board was placed against the nearest wire and the other end was braced against an angle of the scaffolding. Sauer then told plaintiff that it was safe, and plaintiff proceeded to lay the chimney. The Court finds that plaintiff, as well as the other men, knew that the wires carried some current, but that plaintiff did not know that they carried such a high voltage.

Plaintiff had just about finished his work on the chimney when, standing on the scaffolding, he leaned forward around an outer edge of the chimney to check the bubble in a plumb which he was holding against the outer side of the chimney. The plumb was about 4 ft. long and made principally of wood, but with thin copper plating around each of its edges. After checking the bubble, plaintiff inadvertently brought the plumb into contact with one of the hot wires. He saw a flash and was thrown to the ground—a distance of some 16 or 18 ft. onto the dirt immediately outside the house.

He received a cut on his forehead, as well as being stunned. He was taken to a hospital, where he remained for a few days, and did not return to work for about a month. Thereafter he continued to work as a bricklayer for Sauer, avoiding high scaffolds whenever possible, until April 1966, when Sauer's work ran out.

In May 1966 he was in an automobile accident and received serious injuries, including the loss of an eye. Plaintiff claims that his second accident was caused by his first accident and the medicine he was taking for headaches resulting therefrom. Because of the large number of doctors who would have to be brought from the Washington area to testify with respect to the second accident, the parties joined in requesting that the issue of liability be decided before the issue of damages.

The case is controlled by the law of Maryland, where the accident occurred. That law has been stated in many cases in the Court of Appeals of Maryland and in the Fourth Circuit, including Cumberland v. Lottig, 95 Md. 42, 51 A. 841 (1902); State, to use of Bahner v. Consolidated Gas, etc. Co., 159 Md. 138, 150 A. 452 (1930); Conowingo Power Co. v. Maryland, to use of Marshall, 120 F.2d 870 (4 Cir. 1941); Manaia v. Potomac Electric Power Company, 268 F.2d 793 (4 Cir. 1959), cert. den. 361 U.S. 913, 80 S.Ct. 255, 4 L.Ed.2d 183 (1959); Eastern Shore Public Service Co. v. Corbett, 227 Md. 411, 177 A.2d 701 (1962); Southern Maryland Electric Coop. v. Blanchard, 239 Md. 481, 212 A.2d 301 (1965); Driver etc. v. Potomac Electric Power Company, 247 Md. 75, 230 A.2d 321 (1966).

■ The distances prescribed by the National Electric Safety Code are not directly applicable in this case, but they are helpful in considering the question of primary negligence. Defendant was required to exercise a high degree of care under all the circumstances, including the high voltage. All facts considered, the Court finds that defendant was not negligent in failing to relocate the wires sooner than it did, but that it was

negligent in failing to place signs indicating high voltage on the nearest poles after Rinehart visited the site on July 20, in order to warn workmen other than those to whom Rinehart had spoken personally. Not only did defendant fail to place such warning signs, but no one from defendant got in touch with anyone in authority on the job after Rinehart's visits.

On the question of contributory negligence, the Court of Appeals of Maryland has placed a heavy burden on plaintiffs. In the recent case of Southern Maryland Electric Coop. v. Blanchard, supra, the Court of Appeals found the plaintiff guilty of contributory negligence as a matter of law, citing a large number of cases in Maryland and elsewhere. In the course of the discussion the Court said:

"In the early case of Cumberland v. Lottig, 95 Md. 42, 51 A. 841, the court stated that the mother of a 6 year old child 'either saw or could have seen the wires [some 18 inches from the roof of her home] in time to have avoided placing or allowing her child to lie down immediately under the wire.' It then held that irrespective of the question of primary negligence, the injured child, if old enough to understand, was guilty of contributory negligence as a matter of law, and if he were not old enough to understand, the mother was contributorily negligent as a matter of law, which was imputable to the child and prevented his recovery. In other words, the Court held that whether the mother or child had *actual* knowledge of the location of the wire, they were chargeable with such knowledge because it was in plain view.

"State for use of Bahner v. Consolidated Gas, Co., 159 Md. 138, 150 A. 452, involved a party who was erecting, or moving, an aerial. He threw a wire over another one conducting electricity and was electrocuted. In holding that the deceased had been guilty of contributory negligence as a matter of law, the Court stated:

"'He must use reasonable care in examining his surroundings, to observe and take such knowledge of danger as can be attained by observation. In performing the duties of his place, he is bound to take notice of the ordinary operation of familiar laws, and to govern himself accordingly. If he fails to do so the risk is his own.' (citations omitted).

"In the above case, as the man was killed, no one could testify as to his actual knowledge of the presence of the wire or its dangerous propensities. However, the Court held that from the facts and circumstances the deceased must have known of the location of the wire, as it was in plain view, and by its ruling charged him with such knowledge, and also charged him with knowledge of its dangerous character. A similar ruling was made in State v. Eastern Shore Gas & Elec. Co., 155 Md. 660, 142 A. 503, where an aerial wire attached to a pole which was being erected came into contact with defendant's high tension wire passing over the deceased's lot." 239 Md. at 487–488, 212 A.2d at 305.

In the latest case to come before the Court of Appeals, Driver etc. v. Potomac Electric Power Co., 247 Md. 75, 230 A.2d 321 (1966), the Court quoted with approval from Le Vonas v. Acme Paper Board Co., 184 Md. 16, 22, 40 A.2d 43, 46, as follows: "While knowledge of danger is an important factor in determining the question of contributory negligence, a man of ordinary sense and prudence is chargeable with knowledge of danger when he has knowledge of the facts and they are such as are ordinarily sufficient to impress such a man that danger exists." The Court added: "In most cases, the mere fact that a person is aware of the presence of wires is sufficient to charge him with knowledge that they may be dangerous." 247 Md. at 81, 230 A.2d at 325. The Court affirmed the finding of contributory negligence as a matter of law.

Plaintiff in the present case relies on the principle stated in Conowingo Power Co. v. Maryland, to use of Marshall, 120 F.2d 870, 874 (4 Cir. 1941), as follows: "Decedent was working under the direction of his foreman and had a right to assume that he was not being ordered to do something inherently dangerous". It should be noted, however, that the Court immediately added: "it was understood that the high tension wires had been de-energized; and decedent might reasonably have thought that these, as they projected out beyond the lower tension wires, would protect the cable to some extent from coming in contact with the latter". The Court held that the question of contributory negligence was for the jury.

Applying the Maryland law, this Court cannot rule as a matter of law that plaintiff was or was not guilty of contributory negligence, but must decide the question as one of fact.

Although plaintiff said that he did not *know* the wires were hot, he had no reason to believe that they were not hot. The wires had not been re-energized after having been de-energized as in the *Conowingo* case. The Court finds on the weight of the credible evidence that plaintiff's employer had told him that it was safe to work on the platform only after he had pushed the wires aside with the 2 by 4. Under the Maryland cases, including the most recent cases, the presence of the wires charged him with knowledge that they might be dangerous. The Court finds as a fact that plaintiff's own negligence contributed to his injury.

This decision makes it unnecessary to decide whether defendant is entitled to recover over against Lynch.

Neither Sauer nor Lynch carried workmen's compensation insurance. Although this fact creates sympathy for plaintiff, it cannot change the law and the facts with respect to plaintiff's claim against defendant.

The Clerk is directed to enter judgment in favor of defendant.