# MARY ANN HODGES

*vs.*

# THE BALTIMORE ENGINE COMPANY.

*Negligence*: *saw mills; spark arresters. Prayers*: *taking case from jury; ordinary care.*

A prayer seeking to take the case from the jury for want of evidence legally sufficient to entitle the plaintiff to recover, should not be granted if there is any evidence, however slight, legally sufficient to prove his case. p. 314

And in such cases the weight and value of such evidence is for the jury, and not for the court. p. 314

What constitutes care and prudence depends upon the circumstances of each particular case. p. 315

In the use of saw mills, the greater the danger of communicating fire to the property of others, the more precautions and the greater vigilance will be necessary, in order to measure up to the requirements of ordinary care. p. 315

Whether or not the failure to use spark arresters, or other preventatives against sparks, upon the engine of a saw mill, constitutes negligence, depends upon the particular facts and circumstances of the case. *v* p. 316

The mere fact that a saw mill was being used for the benefit of a party, does not render him liable for damages caused by sparks from the engine. p. 317

*Decided June 22nd, 1915.*

Appeal from the Circuit Court for Prince George's County. (BEALL and CAMALIER, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*M. Hampton Magruder* (with whom was *Eugene P. Childs* on the brief), for the appellant.

*S. Marvin Peach* (with whom was *E. Oliver Grimes, Jr.,* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

In the case before us the appellant brought suit against the appellee to recover damages for injury to and destruction of her growing timber and other property by fire, caused by the defendant's alleged negligence in the operation of an engine.

The case was tried before a jury in the Circuit Court for Prince George's County, and at the conclusion of all the testimony the Court directed a verdict for the defendant because of a want of legally sufficient evidence entitling the plaintiff to recover.

The evidence disclosed that the plaintiff, through her son, Ramsey Hodges, on the 29th day of July, 1912, entered into a written contract with one William T. Robinson, by which he agreed to buy and saw or cut all the timber (not including cordwood), consisting of oak, pine, etc., on the lands therein described, situated in Anne Arundel County, Md. He was to pay for the white and chestnut oak four dollars, and for the pine and other timber two dollars and fifty cents per thousand feet, to be paid for each week as it was cut, and none was to be removed from the lands upon which it was located until it was paid for. By the terms of the contract he was given two years and six months in which to cut and remove such timber. The contract also provided

for a forfeit of one hundred and fifty dollars to be paid in the event of his failure to cut all of said timber.

In the latter part of August or the first of September following, Robinson moved his mill upon said lands and proceeded to cut and dispose of the timber under the provisions of the contract. His progress was slow, and as the timber was to be paid for only as it was converted into lumber, the payments to the plaintiff were not sufficient to meet her demands, and the son, in the early part of January, 1913, called upon him to know if he could not advance her two hundred and fifty dollars in anticipation of what was coming to her from the sale of the timber. Mr. Robinson told him that he could not himself advance the money, but thought he might be able to "fix it so he could get it."

A few days after this conversation, Mr. Roup, treasurer of the defendant company, who had been asked by Mr. Robinson to furnish the aforesaid sum of money, and one Mr. White, an experienced timber man, who had been asked by Mr. Roup to accompany him, went upon the lands with Mr. Robinson and Mr. Hodges to ascertain the amount of lumber cut, as well as the amount that could thereafter be cut, from the timber standing thereon, with the view of determining whether he was safe in advancing the aforesaid sum of money for Mrs. Hodges.

Mr. Hodges in his testimony says that at the conclusion of the investigation Mr. Roup said: "We will deal directly with you. We will take over that on the same terms that Mr. Robinson has been cutting here and go ahead, but we will deal directly with you," and that Mr. Robinson would be their representative and would attend to the work for them. Thereafter, on the 6th day of January, 1913, Mr. Roup, as treasurer of the defendant company, entered into a written agreement with Mr. Hodges, by which Hodges sold to him from the aforesaid lands "$250 worth of timber at the rate of $2.50 per thousand feet lumber measure for all kinds except white oak and rock oak, which is to be at the rate of $4 per thousand feet lumber measure. For cash on

the complete execution of this agreement, endorsed by the mortgagee.  \* \* \*  This sale includes the right of ingress and egress and to make roads with as little injury to the lands and woods as possible, and not to injure or interfere with the crops except so far as to get the timber and lumber to the mill and to the shore on the river for shipping same. With the further right at the end of this contract to remove any building or machinery that may have been used for the purpose of manufacturing said lumber."

The mortgagee of said lands, through his attorney, assented to the provisions of the contract, and agreed that the money for said timber should be paid to Mr. Hodges under the contract.

Mr. Hodges further stated in his testimony that he was told by Mr. Robinson, after the execution of the contract with the defendant company, that said company was to pay all expenses in the sawing and cutting of said timber, "and what was over after allowing him personally ten dollars per week, they kept that to pay notes or whatever was due coming on the engine" that Robinson had bought from A. Faulkner Company of York, Penna., who were represented in Baltimore by the defendant company, and the purchase price of which he had not fully paid.

It was also stated by Mr. Hodges in his testimony that he was asked by Mr. Roup, after the execution of the contract with the Baltimore Engine Company, to "see that the teams had grain," which he did, and, as directed by Mr. Roup, the bills therefor were submitted to Mr. Robinson for his O. K., and when approved by him these bills were sent to the Baltimore Engine Company and were paid by it. That it was not until about ten days after the fire that he was notified that the Baltimore Engine Company had ceased to operate the mill and to assume the aforesaid liabilities, at which time Mr. Robinson came to him and said that the Baltimore Engine Company "has declined now to go any further in the matter, and I will cut and pay you as I cut it, or give you

an order before I ship it," and this he did for a while there-after.

In the record are found two letters from Roup, treasurer of the defendant company, to Hodges, one dated May 8, 1913, six days after the fire, and the other dated June 20, 1914, about six months after the institution of this suit. Enclosed with the first of these letters was a statement showing that to May 1, 1913, there had been shipped or delivered during the months of February, March and April, under the aforesaid contract between it and Hodges, lumber amounting only to $200.88 at the prices to be paid therefor by the defendant company to Hodges, which had been cred-ited upon the amount ($250) advanced to him, leaving owing thereon the sum of $49.12. If at such time he had sawed the requisite quantity of timber to repay him for the money so advanced and had ceased sawing under the contract, no mention of this fact is made in the letter. The letter of June 20th also contained a statement showing other deliv-eries of lumber, two of which were on May 3, 1913, and the others on days prior to the last delivery in the preceding statement, but not included therein. By this statement it is shown that the entire sum of $250 had at such time been paid by credits of lumber as aforesaid, and that there was in the hands of the company, after allowing such credits, the sum of $5.75 belonging to Mrs. Hodges for timber cut and sold from the aforesaid lands, for which amount a check was sent to Mr. Hodges, dated June 22, 1914. The letter of June 20, 1914, was brief, merely stating: "We enclose you state-ment of deliveries of lumber of which we have just received a copy from attorneys."

This evidence was, we think, legally sufficient to go to the jury as tending to show that at the time of the fire, which resulted in the injury complained of, the defendant com-pany was operating said engine and mill.

As to how the fire originated and the alleged negligence in the operation of the engine, we have the evidence of Hodges in which he states that the smokestack of the engine had no

cover on it; that he was present at the mill on many occasions when it was running, and at such times had seen many sparks emitted from the smokestack of the engine, and at times had seen fires around about the mill that were caused by such flying sparks, and he had called Mr. Robinson's attention to it, and Robinson had said in reply thereto: "If you put anything on the smokestack the engine would not draw or would not gather steam." That on one occasion, a very windy day, after the woods back of his house had caught fire from sparks from the engine, as he stated, and after such fire was extinguished with much difficulty, he gave to Mr. White, the representative of the defendant company, who was at the time upon the premises, a communication to Mr. Roup, to be delivered to him, in which he complained of the manner in which the engine was operated in respect to the emission of sparks from the smoke stack. In this letter to Mr. Roup he asked him "to see that there was some precaution taken against fires"; that "he would rather he would stop sawing than be in dread of burning out all the timber." He also stated that he suggested to Mr. Robinson, who with Mr. White was superintending the removal of the mill, that when they had located it, that they clean away a large place around and about it, and "fire the woods back against the wind so as to avoid any trouble afterwards from fire in the surrounding woods," and offered to let him have the use of his men to help in doing so. He was, however, not notified when the mill was located, and his suggestion was only partially carried out; the woods on the side of the mill where the fire afterwards occurred was not so burned.

The mill was located, as described in the testimony of Mr. Hodges and John Jennings, in the wide part of a gully or "draw," with a road from it leading up the gully to the hill. The engine was located very near to "a sharp bank which came right down to the engine." This embankment would prevent them from seeing a fire on the top of the hill or on the slope beyond, although only a short distance away. Mr. Hodges, who assisted in putting out the fire, went upon

the lands again on the following day and examined where the fire had burned, and he was asked: "Well, what had been burned where the fire started; could you see? Ans. Well, I could see it had burned, well, I suppose, within fifty feet of the mill."

A number of witnesses, offered by the plaintiff, testified that many sparks were emitted from the engine when in operation and at times fires caught from such sparks. On one occasion a pile of slabs near the mill was destroyed by fire, caused by sparks from the smokestack of the engine.

Jennings, the sawyer, said that at times while at work around and about the engine sparks from the stack fell upon his hands, head and back and burned him, and at other times they caused fires in the woods, as he supposed, although he never directly saw a spark from the engine when it fell causing the fire. That he first saw the smoke from the fire resulting in the injury complained of before dinner; "it was then on the hill about a hundred yards or maybe one hundred and fifty yards, somewhere along there, from the engine." When he returned from home after dinner the fire was "on the rage" and was about twice the distance from the engine that it was when he first saw it. The wind was blowing in from the direction of the engine, and was "blowing a pretty good gale." The witness stated that upon his return to the mill the whistle was blown to call the men to fight the fire, and they at once went to the fire. He was then asked to state "the nearest place where it had burned to the mill. The fire may have been out at that place, but I mean the first burned spot to the mill? Ans. I could not say. Ques. About how far; as far as from here to across the street there? Ans. I couldn't say exactly because I don't know exactly. Ques. As far as from here to the store across the street? Ans. Yes. Ques. About that distance? Ans. Yes."

Benjamin Hatch, who never saw the smoke from the fire until after dinner, stated that at that time the fire "was by the shanty where the sawyer stayed," which was about one

hundred and fifty yards from the engine. He, too, had been burned by sparks from the engine. And James Woods, another witness, testified that Jennings called his attention to the smoke in the woods before dinner, but he did not go to the place of the fire until after dinner, and at that time it was about one hundred and fifty yards from the engine.

Mr. Robinson, who was offered as a witness by the defendant, upon cross-examination was asked where the fire started. He answered: "I do not know; she was going pretty lively when I seen her. Ques. How far did it start, as far as you know, from your engine? Ans. I never saw where it started." When he first saw it, which was after dinner, it was about one hundred and fifty yards from the engine. He never went back to see where it started. When asked how many times the woods caught fire from sparks from the engine before the fire of May 2nd, he answered, saying: "It didn't catch any at all, except it would drop a small fire and the men would put it out. It happened every day, but it didn't amount to anything."

This evidence, in our opinion, was legally sufficient to go to the jury as tending to show that the fire originated from a spark from the smokestack of the engine, and that the engine was at such time negligently operated. We have stated our conclusion without commenting upon the force or weight of the evidence, because of the fact that the judgment of the lower Court will be reversed and a new trial awarded, and we wish it understood that we are deciding only that such evidence has sufficient probative force tending to prove the issues to warrant its submission to the jury for their consideration in determining such issues. The weight of such evidence is a question solely for the jury.

As we have so often said: "A prayer seeking to take a case from the jury for a want of legally sufficient evidence will not be granted if there is any evidence, however slight, legally sufficient as tending to prove it—that is to say, competent, pertinent, and coming from a legal source—but the weight and value of such evidence will be left to the jury";

*Poe's Practice,* page 317, section 295; *Moyer* v. *Justis,* 112
Md. 220, 76 Atl. 496; *McElderry* v. *Flannagan,* 1 H. & G.
308; *Leopard* v. *Ches. & Ohio Canal Co.,* 1 Gill, 222; *Jones*
v. *Jones,* 45 Md. 144; *Mallette* v. *British Assn. Co.,* 91 Md.
481, 46 Atl. 1005; *The Taxicab Co. of Baltimore City* v.
*Emanuel,* 125 Md.

What constitutes ordinary care and prudence in cases of
this character depends upon the. circumstances of the par-
ticular case.   The greater the danger of communicating fire
to the property of others, the more precautions and the
greater vigilance will be necessary in order to measure up
to the requirements of ordinary care; 29 *Cyc.* 462.

It was said in *Martin v. McCrary* (Tenn.), 1 L. R. A.
(N. S.) 530: "The degree of care required by one thresh-
ing wheat with a steam thresher, in respect of setting fires,
is the same as that devolved upon railway companies in the
use of their engines.   That rule, as laid down in *Louisville
& N. R. Co.* v. *Fort,* 112 Tenn. 432, 80 S. W. 429, is that
'care commensurate with the risk or hazard must be used.'
In the same opinion the degree of care required is thus char-
acterized: 'A degree of care and prudence commensurate
with the danger to which the property is exposed by them in
the lawful conduct of their business.'   * * *   Again it is
said: 'As the danger necessarily attending the use of fire
in locomotives is far greater in some places and upon some
occasions than others, what is reasonable care in their equip-
ment and management must all depend upon the facts and
circumstances of each case.   What would be ordinary care
in the operation of them in the country, or in a wet season,
might be gross negligence in a town or city, or in a drouth,
where and when the danger of communicating the fire is, in
the very nature of things, much greater.' "

Applying these principles to the present case, there can be
no doubt in our minds that the evidence as stated above
tends to show negligence in the operation of the mill, and,
as we have said, should have been submitted to the jury for
their consideration.

The plaintiff asked for three instructions. As the afore-said second prayer of the defendant, directing a verdict for the defendant, was granted, the said prayers of the plaintiff were rejected. These prayers, however, we think should not have been granted in the form presented, even though the Court had rejected the second prayer of the defendant.

In the first of these prayers, the chief objection would seem to be that the jury was not required to find that the fire was caused by sparks escaping from the smokestack of the engine, as alleged in the declaration, but that said "engine was the occasion of the fire." This, we think, was too uncertain and indefinite in its meaning. As we have said, whether there is or is not negligence in cases like the one before us, where spark arresters or other preventatives against emission of sparks are not used, is dependent upon the facts and circumstances of each case; and in granting instructions in such cases this fact should be borne in mind and the prayer so framed as to make the negligence dependent upon such facts and circumstances.

The second of these prayers is upon the theory that the contract between Hodges and Robinson was taken over by the defendant company. The record shows no assignment of this contract and there is not, in our opinion, any legally sufficient evidence to support this theory. The contract with Robinson, as well as the contract with the defendant company, is in writing. Robinson, in his contract, bought and agreed to saw and cut all the timber upon the land named in the contract within the time therein named, with a forfeit upon his failure to do so. The contract with the defendant company was only for the sale of $250 worth of timber to be cut from the aforesaid lands, with no limitations as to time, at the same consideration per thousand feet, it is true; but there was no obligation upon it, as upon Robinson, to cut all of said timber; its contract was at an end when $250 worth of timber was cut, removed and paid for; this was not true of the Robinson contract. From the evidence in the record, including that of Robinson, it is a fair inference

that Robinson not only knew of, but assented to the sale of $250 worth of timber to the defendant company, which it seems was included within the timber bought by him under his contract. The evidence that we have said should have been submitted to the jury tending to show that at the time of the fire the engine and mill was operated by the defendant company, was not because the defendant company had taken over the contract of Robinson, but that it was operating the mill under or as a result of its own contract.

It is upon this theory that the third prayer was offered. But this prayer, in addition to the other objections that might be urged against it, is defective, we think, because it does not with sufficient directness and definiteness require the jury to find that at the time of the fire the engine was operated and managed by the defendant company. It may in a sense have been used for the benefit of the company, and yet there might not have attached to the defendant the liability sought to be imposed upon it. Moreover, the finding of negligence on the part of the defendant was dependent upon all the testimony, both plaintiff's and defendant's, under all the facts and circumstances of the case.

As to the remaining exception, the one upon the admission of testimony, it was clearly the right of the defendant to show, if it could, in the absence of any direct evidence, such as that of an eye-witness, that the fire complained of originated from sparks from the engine, facts and circumstances from which it might reasonably be inferred that the fire originated from other causes. But we think the question here asked in relation to the condition of a mill a mile away was inadmissible even for such purpose.

For error in granting defendant's second prayer, the judgment of the Court below will be reversed and a new trial awarded.

*Judgment reversed and a new trial awarded,*
*appellee to pay the costs.*