# EASTERN SHORE PUBLIC SERVICE CO. *v.* CORBETT, OWN USE AND USE OF U. S. CASUALTY CO.

[No. 71, September Term, 1961.]

412

*Decided January 25, 1962.*

*Original majority opinion adhered to in Per Curiam Order filed May 7, 1962, after reargument,* HENDERSON, HORNEY and SYBERT, JJ., *dissenting.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and SYBERT, JJ., and reargued before the full Court.

*William W. Travers* and *John W. T. Webb,* with whom were *Webb & Travers* and *K. King Burnett* on the brief, for appellant.

*Charles B. Heyman* and *Solomon Kaplan,* with whom were *Sol C. Berenholtz* and *Walter D. Webster* on the brief, for appellee.

*John H. Mudd* and *William J. McWilliams,* with whom were *Semmes, Bowen & Semmes, McWilliams & Melvin* and *Webb & Travers* on the brief, for the appellant on the rehearing.

*Sol C. Berenholtz,* with whom were *Solomon Kaplan* and *Charles B. Heyman* on the brief, for the appellee on the rehearing.

PRESCOTT, J., delivered the opinion of the Court.

Suit having been instituted in the Circuit Court for Wicomico County by the plaintiff, Maurice Corbett, to his own use and the use of his employer's compensation carrier, to recover damages for injuries sustained by him as the consequence of an accident in which he was involved, a jury rendered a verdict of $12,500 in his favor; and the defendant, Eastern Shore Public Service Company of Maryland (hereafter referred to as the Company, or appellant), has appealed.

The Company is an electrical utility serving, among other localities, Salisbury and its environs. Patrons desiring electricity for commerical use frequently apply in the form of a letter, and on occasions verbally. As soon as the Company is notified that service is desired, its facilities are made ready to supply the electricity when called for, or likely to be used. Numerous elements enter into the rates to be charged to commercial users, such as whether or not a pole line has to be built to serve the particular customer, the quantity of electricity likely to be required, and the times when it will be so required; hence, we see there are reasons for negotiation before a final order for service to such users.

During 1954, a building, the Medical Center Building, located just south of Salisbury, was under construction by a general contractor, and, in accordance with the usual practice, an application was made for "temporary service" of the type generally used by contractors for electrical appliances while they are in the process of building. The customary procedure was followed by the applicant placing a pole in the ground and attaching the necessary equipment thereto, all properly grounded for electricity. The company then ran wires to the pole, and made available the necessary electricity. In this instance, the temporary service was begun on October 27, 1954, and was used throughout the entire construction

period and until after the date of the accident described herein. Not being a domestic user and realizing that permanent service would be required in the future, a representative of the Medical Center had begun negotiations for commercial type of service sometime prior to October 26, 1954. These negotiations culminated in an agreement between the Company and the Medical Center on June 24, 1955.

After reaching an understanding with the patron, the Company began to prepare plans, obtain materials, and get ready generally for rendering service in accordance with the request. To fulfill the obligation entered into, the Company ran a high tension line from a high tension line then existing and running adjacent to a highway not far distant. There were about four new poles put up with wires, cross-arms, and other equipment. On the last pole, a transformer was placed to reduce the current to lower voltage for use in the building to be serviced. "Service wires" were run from this transformer to a "rack" which was attached to what is known in the trade as a "mast" all of which are described below. Here, the Company's property stopped. The wiring in the building was brought outside thereof to this point by the electrical contractor.

The service wires did not cross the top of the building, but ran to the rack, attached to the mast, which ran along the side of the building and some 5½ feet above the roof. They were four in number and eight inches apart; the top wire was neutral, *i.e.*, it carried no voltage but was a "ground," and the bottom three carried voltage when energized. When energized, the voltage between any two of the bottom three wires was 217 volts; between any one of these wires and the mast, the voltage was 125 volts. The bottom wire was at least ten feet above the ground and twenty-nine inches above the level of the roof. The experts produced by both sides testified that, in order to get a shock, a person would have to touch any two of the bottom wires at the same time, or one of them and the mast, the neutral wire, or any other ground. There was testimony that the roof was a good insulator when dry (as it was at the time of the plaintiff's injuries), and it was unlikely that it would operate as a ground so as to permit the current to pass through a person standing thereon.

All agreed that contact with the mast, alone, would not produce shock.

The "rack" was a metal device with two parallel stationary standards. One standard was curved so that it would fit against a pipe or pole and the other standard was a small metal bar attached at both ends to the other standard, and on this bar were four porcelain spools. The porcelain spools acted as insulators, and were so intended that a wire could be attached to them very easily without coming in contact with metal at any point.

The wires were stripped of their insulation or weatherproofing for some 8 or 10 inches from their ends, and attached to the porcelain spools or insulators by a "bail type dead end," instead of wrapping the wire itself around the spool or porcelain insulator and fastening (and taping) the other end to the wire itself, without removing any of the insulation from the wire (the latter is called the "pigtail" method). The dead end was a metal mechanical device made in a U-shape of a size to fit around the porcelain insulator. The wire was then inserted into, and passed several inches through, a hole in a portion of the dead end which was attached to, and closed, the open end of the U. The dead end itself was energized when the wires were. Electrical energy would not, however, go beyond the "dead ends" because the spools, or insulators, would prevent it from doing so.

The mast was a four inch hollow metal cylinder that extended from the ground along side of the building to the roof and then above the level of the roof a distance of five feet four inches, being capped by a semicircular hood, obviously as a protection from the weather. It was erected by the electrical contractor of the Medical Center; and its purpose was to act as a conduit for the electrical wires, which would conduct electricity into the building through the permanent installation, when completed. Protruding from the top of the mast were four large insulated wires, which were to be connected to the four service wires, but, due to the fact that the electrical work within the building had not been completed, were left "dangling."

After the workmen of the Company had installed the service wires, the dead ends, and the rack, the wires and the dead

ends were energized on the morning of the accident, according to the Company's answer to an interrogatory relative thereto. No request had been made to the Company to energize the wires. The Company did not notify the owner, the general contractor, or anyone else that current had been put into the wires; nor did it enclose the wires or place any signs on, or near, the mast giving notice that the wires were energized.

At this time, the building was, roughly, one-half completed. Although the exterior had been constructed, there was still much to be done. The line crew of the Company not only saw ladders, sandpiles, and other materials and equipment on the premises, which clearly indicated that work was still being performed upon the building, but actually saw painters, carpenters, and other workmen laboring on and about the building.

On August 5, 1955, a very hot, dry day, the plaintiff, who had been painting the building for about two weeks, was working under the direction and supervision of his foreman, Walter McDorman. Together, they were painting the outside trim work, which included the mast mentioned above. When they reached the point where the mast was located, McDorman ordered Corbett to paint it. At this time, neither of them knew that the service wires were energized; but, on the other hand, both knew the building was being temporarily supplied with electricity by an entirely different set of wires and that the electrical work on the inside of the building had not been completed, and both saw that the wires coming from the conduit had not been connected to the service wires, leading them to believe that the installation was incomplete and the wires harmless. In compliance with McDorman's direction to paint the mast, Corbett ascended a ladder to the roof, which was about ten feet eight inches from the ground. McDorman was working from the ladder just below Corbett, and could see him "if he looked up." Corbett testified that he made one stroke on the mast with his brush, when he received a shock and was knocked unconscious. McDorman stated that he heard Corbett "holler," looked up quickly and saw Corbett going one way and the paint bucket the other. Corbett landed on the roof some six to eight feet from the mast. McDorman thought he was dead, but he finally regained consciousness and, after consider-

able difficulty, McDorman got him to the hospital. At the hospital, he was treated by Dr. Insley, who testified that Corbett "Had suffered an electric shock," which caused him to be "thrown to the ground," fracturing his right scapula and injuring his right shoulder.

Within an hour after the accident, officials of the Company had the service wires de-energized, and they remained in that condition until October 27, 1955.

It has been necessary to set forth the facts at some length due to the nature of the case and the further fact that the appellants have not only raised the usual questions presented in negligence cases, such as the insufficiency of the evidence to establish primary negligence and that the plaintiff was guilty of contributory negligence as a matter of law, but several others, besides.

## I

The appellant argues that the plaintiff failed to prove any primary negligence upon its part. First, it claims the plaintiff's own "uncontradicted, unequivocal" testimony showed that none of its instrumentalities caused the injuries to the plaintiff. This claim is based upon the fact that the plaintiff, on cross-examination, stated that he did not touch the wires of the defendant at any point, nor did he touch the mast head with anything except his paint brush; and the experts had testified appellee could only receive a shock by touching any two of the bottom three wires, or any one of the bottom three wires and a ground.

A few States have held that a party to a suit is bound by a definite statement of fact within his knowledge, objective or subjective, as against not only his own conflicting testimony, but that of his own witnesses, that of the other party's witnesses, and that of the other party, attempting to rationalize this strict rule by relating it to the doctrine of judicial admissions or admissions of counsel. The cases are collected in an annotation in 169 A.L.R., beginning at page 815. But the same annotation, at page 804, states the older practice and the prevailing rule is, that, where the self-injuring testimony of a party falls short of a quasi-judicial admission and is contradicted by other evidence, it is to be treated by the court as merely that of a witness, to be considered as evidence by the

trier of facts in arriving at a conclusion on the whole case. And this is particularly true where the testimony of a party relates, not to a fact peculiarly within his knowledge and as to which he could not be mistaken, but is in the nature of an estimate or opinion as to which he may be honestly mistaken; he does not unequivocally concede that the fact is in accord with the opinion expressed, and there is no injustice in permitting the court to consider the other evidence in the case, and determine from all the evidence what the actual facts are. *Ibid,* p. 803. Cf. 9 Wigmore, *Evidence,* § 2594 a (3rd Ed.).

The appellant's argument in this respect loses sight of the fact that the plaintiff had received only a grade-school education, had spent his entire life working as a waterman or a painter, and did not express himself so exactly, precisely, and articulately as a person of higher education or wider business experience. The plaintiff's evidence disclosed that the electrical current in appellant's wires was the only current in the vicinity of where the plaintiff was working. The plaintiff testified flatly and unequivocally that he received an electrical shock. His foreman testified he heard the plaintiff yell and saw him fall away from the mast to the roof. The foreman thought he was dead. Dr. Insley, who saw the plaintiff at the hospital very shortly after he was injured, stated that he had sustained an electrical shock. And the plaintiff summed up his recollection of the accident in this manner: "The only thing I know when I made the first stroke with my brush [when starting to paint the mast] all I remember I was in a flame of fire and knocked unconscious. After that I knew nothing for a short period of time. Whatever caused it, I don't know." A consideration of the above testimony shows, we think, that the trial judge acted properly in submitting to the jury the question of whether the plaintiff had received an electric shock from the appellant's energized wires, and was injured as a result thereof. Cf. *United Rys. Co. v. Corbin,* 109 Md. 442, 72 A. 606; *Detroit Edison Co. v. Ewing,* 122 F. 2d 852 (C. A., 6th).

Pursuing the question of primary negligence, the appellant contends that it complied with the provisions of the National Electric Code (Safety Code), and there was in-

sufficient evidence in the case to show that it could reasonably foresee that a workman on the building would make contact with its line; hence it was free of negligence. The appellant did offer testimony to the effect that its installation of the service wires was in accord with the provisions of the Safety Code. However, the plaintiff offered William C. Feige as an expert witness. He had had nearly forty years' experience in the electrical field; was a licensed professional engineer in four states; and had been a consulting electrical engineer since 1945. He was licensed master electrician in Baltimore, and had been employed by the Gas and Electric Company of that City for 22 years from 1923. He stated that in all of his experience in the electrical field, he had never seen a "dead end" installation similar to that made by the defendant in this case; that the most conventional method of installation was to carry the insulated wires around the spools on the rack and then to wrap the ends, pigtail fashion, around the wires, taping the ends for insulating purposes. And if the installation had been made in this fashion, no one could have received an electrical shock from an accidental contact with the wire. Furthermore, from his inspection of the service wires involved herein, he knew of no reason why they "should not have been insulated." He also stated that although the installation made by the defendant was neither "electrically or mechanically" in violation of the Safety Code, in his opinion it was an improper one from a safety point of view; that Section 1113 of the Safety Code requires that electrical equipment operating at 50 volts or more should be guarded against accidental contact by enclosure, or by locating the equipment where it will not be readily accessible to unqualified persons; and he thought the installation terminated too close to the roof. He also testified the customary time in the utility industry to energize service drop wires leading to a new building is when the meter is installed and connected.

Of course, the Safety Code has not been given legislative sanction in Maryland, as it has been in some states. (Where given such sanction, it is generally provided that compliance with the Safety Code is prima facie evidence of a lack of negligence. *Berry v. Atlantic Coast Line Ry. Co.*, 273 F. 2d

572, 577 [C. A., 4th, 1960]). We do not deem it necessary nor desirable under the facts of this case to express any opinion relative thereto such as the Court did in *Smith v. Iowa Public Service Co.,* 6 N. W. 2d 123 (Iowa), for we have set forth Mr. Feige's testimony somewhat at length to show that the appellant's claim that its installation fully complied with the provisions of the Safety Code and met all of the usual and customary requirements in the utility industry was seriously disputed and contested.

The plaintiff's evidence was sufficient, we think, to take the case to the jury on the question of primary negligence. In the early case of *Cumberland v. Lottig,* 95 Md. 42, 51 A. 841, where a mother, after dark, had used a step-ladder to reach a trap-door that led to a seldom used roof of her home for the purpose of watching a theatrical performance on the opposite side of the street, and had taken with her her infant son about six years old, who was injured by coming in contact with a low hanging electrical wire running across the roof, this Court, after stating that the mother and/or the child were guilty of contributory negligence as a matter of law, pointed out the difference between that case and *Brown v. The Edison Elec. Co.,* 90 Md. 400, 45 A. 182, where a boy was directed by his employer to go upon the roof of a store to clean it and the rain-spout, and while thus engaged, he came in contact with a low strung electric wire and was injured. The Court stated that with reference to the *Brown* case, "the very nature of the business (supplying electricity) thus conducted by the Electric Company imposed upon it a legal duty to see that its wires when strung where *persons were liable to come in contact with them* were properly placed and insulated with reference to the safety *of such persons*—and that this was especially so in reference to a person who in the exercise of *a lawful occupation in a place where he had a legal right to be,* was liable to be injured by contact with the wires." This language seems to be particularly apposite to the facts of the case at bar.[1]

---

1. Of course, we do not suggest nor intimate, by what we have said, that a supplier of electricity must insulate all its wires, whereever located. Le Vonas v. Acme Paper Board Co., 184 Md. 16, 40 A. 2d 43.

The Medical Center Building, at the time of the injury to Corbett, was only about fifty per cent complete. Corbett was in a place where he had a lawful right to be, performing the work of his daily occupation. The Company's employees knew there were laborers and painters still working upon the building. The service wires, with the dangling unconnected wires coming from the mast head and the well-known fact of the temporary service hook-up, did not, as a matter of law, give notice to an ordinarily careful and prudent person that they carried electrical current. Yet, the Company's employees energized the wires without giving notice to anyone. Cf. *Conowingo Power Co. v. State of Maryland,* 120 F. 2d 870 (C. A., 4th); *Southern Pacific Co. v. McCready,* 47 F. 2d 673 (C. A., 9th); *Ashby v. Philadelphia Elec. Co.,* 195 A. 887 (Pa.). And notwithstanding the lowest service wire was only 29 inches above the roof, the dead-ends were not insulated,[2] nor were they protected against accidental contact by enclosure or otherwise. Cf. Section 1113 of the Safety Code. These factors, namely, the proper location of the wires, their effective insulation or enclosure if the location were where people, lawfully and legally, were likely to go, whether for work, business or pleasure, and whether notice should have been given by the Company when it energized the wires were proper ones, under the facts of this case, for the jury's consideration in determining whether due and proper diligence, under the circumstances, had been exercised by the Company in the transmission of an agency with such dangerous and elusive propensities as electricity. And we think the facts, as we have stated them above, were sufficient to support a finding by the jury that the injury to the plaintiff was reasonably foreseeable by the Company. *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758.

## II

In its next assignment of error the appellant urges: (a) that the trial court should have granted its request for a

2. Le Vonas v. Acme Paper Board Co., 184 Md. 16, 40 A. 2d 43; Brown v. Edison Elec. Co., supra; Manaia v. Potomac Electric Power Company, 268 F. 2d 793 (C. A., 4th).

directed verdict on the ground that the plaintiff had been guilty of contributory negligence as a matter of law; and (b), if he received a shock from its wires, he had "assumed the risk." What we said under I above partially answers these contentions.

## (a)

A reading of the Maryland cases [3] leaves little, if any, doubt that one, who receives injuries as a result of a negligent contact with a wire conducting electrical current, which he knew, or in the exercise of ordinary care and caution should have known, was dangerous and/or possibly deadly, cannot recover against the owner of the wire, for, where such facts exist, negligence will be presumed as a matter of law. And, as electricity is so widely, almost universally, used today, it is common knowledge that it is usually dangerous to a certain degree. *Potomac Edison Co. v. State,* 168 Md. 156, 177 A. 163. But the question for determination here is not whether the plaintiff was negligent in touching or coming near to a wire which he knew or, in the exercise of due diligence, should have known to be dangerous, but, whether under the circumstances related above, he was, as a matter of law, bound to know that it was dangerous. *State v. Potomac Edison Co.,* 166 Md. 138, 170 A. 568. Cf. *Conowingo Power Co. v. State,* 120 F. 2d 870 (C. A. 4th); *Detroit Edison Co. v. Ewing,* 122 F. 2d 852 (C. A. 6th).

It is undisputed that the plaintiff had no actual knowledge that the service wires were energized. The testimony further discloses that he knew that electricity to the building under construction was coming from a temporary line; that the building was under construction and would not be completed for quite a long period of time; that he received specific instructions from his foreman to paint the mast; that he knew the electrical contractor was still working in the interior of the building, and his (the electrical contractor's) work was not complete and was not ready to be used in connection

---

**3.** State v. Eastern Shore Gas & Electric Co., 155 Md. 660, 142 A. 503; Le Vonas v. Acme Paper Board Co., supra; State v. Consolidated Gas Co., supra; Cumberland v. Lottig, supra; State v. Crisfield Ice Mfg. Co., 118 Md. 521, 85 A. 615.

with the permanent wiring; and that he observed the wires hanging loose and unconnected from the mast head. Under these circumstances and those that we have set forth above in more detail, we hold that the plaintiff should not, as a matter of law, be charged with knowledge that the service wires were live, or energized; hence the question of contributory negligence was properly submitted to the jury.

### (b)

We shall not discuss the differences between "assumption of risk" and "contributory negligence" as suggested by the parties. In order to prevent a long opinion from being longer, it will suffice to say that it should be obvious from what we have already stated that there is no basis in this case for the application of the doctrine of assumption of risk by the plaintiff as a matter of law.

### III

This brings us to a consideration of probably the most important question presented. During the progress of the trial below, the plaintiff requested eleven written instructions. All were granted except numbers 5 and 8. The appellant particularly objects to the contents of numbers 3 and 6, dealing with the degree of care and caution required of the defendant. Number 3 informed the jury:

> "The Court instructs the jury that the defendant * * * owed the Plaintiff the duty of exercising the highest degree of care to prevent him from being injured by contact with its wires and equipment although the wires involved carried approximately 120/208 volts instead of higher voltages."

Number 6 went one step further and told the jurors that it was their function "to determine whether or not the said defendant fulfilled its duty of exercising *the very highest degree of care* (italics ours) practicable under all the circumstances of this case."

The court then proceeded to instruct the jury orally, during which he read most, if not all, of the granted written instructions, which, of course, included plaintiff's prayers 3 and 6, quoted in part above.

It must be borne in mind that in the instant case we are dealing with wires that carried only about 120 to 208 volts, the usual supply to a household, rather than high tension voltages. Although it is generally recognized that such voltages (120 to 208) will give a person a shock and cause spontaneous impulses and involuntary reactions, there is no testimony that they are, of themselves, inherently deadly or likely to result in serious bodily harm (this is especially true when the person is not sitting or standing in water or has some other particularly effective ground). Nor is there any contention that the plaintiff received a shock from a current of greater severity than the 120 to 208 volts, by reason of faulty transformers, or otherwise. Our holding on the point under consideration is, therefore, based upon, and limited to, the voltages specified.

The courts and text-writers in this country are in very general accord that electric companies are not insurers.[4] In dealing with cases that have involved high tension currents, where the peril to life and limb was imminent and intense, the decisions have utilized a variety of terms to describe the diligence required of electric companies: ordinary care; high degree of care; very high degree of care; great care; very great care; greatest degree of care; highest degree of care; very highest degree of care; highest degree of care practicable; and utmost degree of care.[5] The primary rule relative to the diligence required of electric companies, running through all of the decisions, is that they must observe such care as is commensurate with the danger involved. Thus, many cases, considering the term "ordinary care" as a relative expression (meaning commensurate, due, or proper care under the circumstances), have used the same in describing the obligation of

4. The Maryland decisions agree: see, for example, Walter v. Balto. Electric Co., 109 Md. 513, 71 A. 953.

5. Curtis, Law of Electricity, §§ 405, 406; 29 C.J.S., Electricity § 39; 18 Am. Jur., Electricity, § 48; United Rys. Co. v. Corbin, 109 Md. 442, 72 A. 606; Hagerstown & F. Ry. Co. v. State, 139 Md. 507, 115 A. 783; Conowingo Power Co. v. State, 120 F. 2d 870 (C. A., 4th) Manaia v. Potomac Electric Power Co., 268 F. 2d 793 (C. A., 4th).

electric companies, even when high pressure currents were under consideration. Curtis, *Law of Electricity*, § 405.

We have examined a great number of decisions and read from many authorities; but have found no case of low voltage where the Court instructed the jury that the power company was required to exercise the "highest degree of care" under the circumstances. *Alabama Power Co. v. Irwin*, 72 So. 2d 300 (Ala.), was a case where a 110 volt uninsulated service, under unusual circumstances, resulted in death; yet the Court stated the power company's duty was to exercise a degree of care commensurate with the danger involved.

The trial court's instructions in the case at bar placed, we think, too great a burden upon the defendant. Ordinary negligence in this State has traditionally been recognized as a relative term to be measured by the "reasonable man" standard. The test to be applied is whether the defendant exercised such care and caution as a reasonably prudent man would have exercised under all of the surrounding circumstances of the case, with the *amount* of care and caution corresponding to the capacity to injure, so that the greater the danger, the greater the vigilance required to measure up to the standards of ordinary care. *Lehmann v. Johnson*, 218 Md. 343, 346, 146 A. 2d 886; *Bryer v. Rath Packing Co.*, 221 Md. 105, 156 A. 2d 442; *Hodges v. Baltimore Engine Co.*, 126 Md. 307, 94 A. 1040. Cf. *State v. Consolidated Gas Co.*, 159 Md. 138, 143, 150 A. 452; Curtis, *Law of Electricity* § 411; *Hagerstown & Frederick Ry. Co. v. State*, 139 Md. 507, 511, 115 A. 783; *Le Vonas v. Acme Paper Board Co., supra; State v. Consolidated Gas Co., supra; State v. Potomac Edison Co.*, 166 Md. 138, 170 A. 568; *State v. Eastern Shore Gas & Elec. Co., supra; City of Decatur v. Eady*, 115 N. E. 577 (Ind.). This Court rejected the use of a standard of "high degree of care" in *Armour & Co. v. Leasure*, 177 Md. 393, 410, 9 A. 2d 572, and held in *W., B. & A. R. Co. v. State*, 136 Md. 103, 116-118, 111 A. 164, that an instruction stating that the defendant was to be held to the "highest degree of care and skill practicable under all the circumstances" was error, even though another instruction stated the test to be that of "reasonable care." Cf. *Dickey v. Hochschild, Kohn & Co.*, 157 Md. 448, 146 A. 282; and plaintiff's first prayer in *United Rys. v.*

*Corbin,* 109 Md. 442, 72 A. 606, a high voltage case. We hold that the trial court's instructions to the jury in this case, involving low voltages which are not ordinarily nor inherently perilous to life or grave bodily hurt, that the defendant owed to the plaintiff the duty "of exercising the highest degree of care" and "the very highest degree of care practicable under all the circumstances" to prevent his injury constituted prejudicial error, which will require a new trial upon the question of liability. Cf. Annotation 69 A.L.R. 2d 15 § 3.

## IV

At this point, the appellant claims the trial court erred "in not instructing the jury that defendant was liable only for injuries that were reasonably foreseeable." Of course, "reasonable foreseeability" is an essential ingredient of actionable negligence. We restated this well-known fact relating to the law of negligence as recently as 1961 in *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758. However, no question concerning the same is properly before us: no request was made by the appellant for such an instruction; nor was any objection made to the court's instructions on the question of foreseeability. When no objection is taken to the trial court's instructions, they become the law of the case. Maryland Rule 554 e.

## V

The appellant concludes its assignments of error by claiming the trial court should have granted its motion to instruct the jurors to "disregard" the appellee's so-called "per diem argument" as to damages. This argument, which occurred during the closing argument of plaintiff's counsel, was as follows:

> "Covering that period of six weeks, if you allow us $5.00 an hour for that pain and suffering of being in the hospital, being immobilized—. * * * I would suggest that $5.00 an hour would amount to 1008 hours for a period of six weeks. That would amount to $5,040. Purely a suggestion. You may feel it is inadequate. You may feel it is too high. You rely on your own judgment.
>
> "Thereafter, the testimony shows that he continued

> to remain under treatment after he left the hospital for five and a half months. He was under treatment for a total of seven months. And he remained under treatment for an additional five and a half months. That would total 4032 hours. And I would say for that period even if we only allowed him $1.00 an hour, ladies and gentlemen, that would amount to $4,032."

This type of argument relating to damages has been widely discussed and considered, in recent times, by decisional law as well as writers upon the subject. In *Harper v. Higgs,* 225 Md. 24, 169 A. 2d 661, although we did not reach the propriety of such an argument as a general proposition, nor decide the same, we did discuss the matter at some length, citing quite a number of court decisions and articles relating thereto.

There can be little doubt but that there is considerable conflict in the decisions of the different jurisdictions where the proposition has been considered. As we pointed out in *Harper, supra,* in *Ratner v. Arrington,* 111 So. 2d 82 (Fla. App.), most of the reasons and arguments for and against the propriety of such arguments by counsel are set forth and discussed. The arguments against include: there is no evidentiary basis for converting pain and suffering into monetary terms; to suggest monetary equivalents for pain and suffering amounts to the giving of testimony or the expression of opinion not disclosed by the evidence; juries frequently are misled into the making of excessive awards, and admonitions of the Judge do not erase the prejudice; and the defendant is put at a disadvantage by being · required to rebut an argument having no basis in the evidence. Among the arguments for allowing the per diem formula are the following: it is necessary that the jury be guided by some reasonable and practical considerations; a trier of facts should not be relegated to a guess; the very absence of any evidentiary yardstick makes the contention that counsel's suggestion mislead the jury highly doubtful; the argument does no more than present one method of reasoning which the trier of the facts may employ to aid him in making a reasonable and sane estimate;

that the argument is not evidence but only illustration or suggestion and that the claimed danger that it will be mistaken for evidence is not only exaggerated but is dispelled by the court's instructions on the point; and, finally, that when counsel for one side has made such an argument the opposing counsel is equally free to suggest his own amounts from the same evidence available to plaintiff's counsel.

According to a discussion of the subject at the Maryland Judicial Conference of 1960, the per diem form of argument was allowed by most, but not all, of the trial judges of this State. And we stated in *Harper* that this seemed to be in accord with the majority rule, citing the annotation in 60 A.L.R. 2d 1331 and O'Connor, "Some Anti-Biotic Thoughts in an Anti-Botta World," Daily Record, February 4, 1961.

We do not deem it necessary to labor the question further. We think the reasons for permitting such arguments, without repeating them, and the benefits to be derived therefrom outweigh the grounds suggested against their allowance and any disadvantages that might result from such arguments. When used, the arguments of counsel should be accompanied, if requested, or the trial judge, sua sponte, thinks it proper, by cautionary instructions that the argument is not evidence and the jury, alone, must determine the proper verdict. Ordinarily, we think, it would be the wiser practice that such cautionary instructions should be given even without any specific request therefor. Where the argument is made for the first time in the plaintiff's closing argument, the defendant's counsel should be granted a reasonable amount of time to rebut it. We, therefore, hold that there was no impropriety in permitting the argument of plaintiff's counsel quoted above.

> *Judgment reversed, and case remanded for a new trial upon the question of liability alone. Costs below to abide the result; costs in this Court to be paid by the appellee.*

SYBERT, J., filed the following opinion, dissenting in part, in which HENDERSON and HORNEY, JJ., concurred.

While I concur in the majority opinion as to all of the points discussed except the final one, I find myself unable to agree that it is proper to permit plaintiff's counsel, in a personal injury case, to suggest and argue to the jury an amount to be allowed for pain and suffering computed on a per diem or mathematical formula basis.

As mentioned in the majority opinion and in *Harper v. Higgs,* 225 Md. 24, 169 A. 2d 661 (1961), the propriety of the per diem argument as to damages has evoked considerable judicial and other discussion in recent years. The reasoning and the results have been sharply divergent, so that one seeking the weight of authority finds the answer inconclusive. A note at page 189 of the University of Florida Law Review, Vol. XIV, No. 2, published in the Summer of 1961, lists seven states and one Federal Circuit Court as jurisdictions which refuse to permit the argument, and nine states and two Federal Circuits as allowing it in one form or another. North Dakota and West Virginia were not included in the list of the seven states prohibiting the argument. The Supreme Court of North Dakota, in February, 1961, and the Supreme Court of Appeals of West Virginia, in June, 1961, reversed judgments and ordered new trials because counsel had used mathematical formula arguments as to pain and suffering. *King v. Railway Express Agency, Inc.* (N. D. 1961), 107 N. W. 2d 509; *Crum v. Ward* (W. Va. 1961), 122 S. E. 2d 18. An exact "color matching" of the cases is not entirely feasible, since three general views (with variations) have emerged: the per diem argument should not be permitted as a matter of law; counsel has the right to use it; the matter should be left to the discretion of the trial judge.

I am apprehensive that the majority ruling permitting such formula arguments may prove to be the opening of a Pandora's box with respect to verdicts in personal injury cases. Unjustified verdicts, as well as an increase in the number of appeals to test the trial judges' exercise of discretion in the extent of the latitude allowed counsel in use of the argument.

or in refusing motions for a new trial, may be a not unnatural result. The sounder course would seem to be a holding that the per diem argument is not permissible as a matter of law.

It has long been recognized in this State and elsewhere that there is no fixed rule or yardstick by which to measure with mathematical exactitude the precise amount of damages for physical pain and suffering and mental anguish endured in personal injury cases. It is within the province of the jury to determine from the evidence what is fair and reasonable compensation, and a jury's verdict will not be disturbed unless it appears that it was influenced by partiality, prejudice, corruption, or by some mistaken view of the evidence. *Adams v. Benson,* 208 Md. 261, 117 A. 2d 881 (1955); *Certified T. V. & Appliance Co. v. Harrington* (Va. 1959), 109 S. E. 2d 126; 15 Am. Jur., *Damages,* § 71, p. 479. The standard of "fair and reasonable compensation" came into use because a more specific one is impossible. Thus it has been the jury's function to find a verdict representing the independent collective judgment of its members arrived at after evaluation of the evidence in the light of their own intelligence and experience.

The decisions holding it to be prejudicial error to permit use of mathematical formula arguments, whether accompanied by use of a blackboard or chart or without such aids, usually follow the reasoning found in *Botta v. Brunner* (N. J. 1958), 138 A. 2d 713, 60 A.L.R. 2d 1331, where it was said that in an action for bodily injuries, it is unwarranted intrusion into the jury's domain for plaintiff's counsel to suggest in his summation to the jury a monetary mathematical formula, based on a specified amount per hour for the admeasurement of damages for pain and suffering, since there can be no fixed basis, table, standard, or mathematical rule which will serve as an accurate index and guide to the establishment of awards of damages for personal injuries, as there is no measure by which the amount of pain and suffering endured by a particular human can be calculated, and no standard of value which can be applied. The *Botta* case cites a number of decisions in support of the holding therein. Later cases to the same effect, as well as decisions reaching the opposite result, and authorities per-

mitting the mathematical formula argument when cautionary safeguards are applied, are cited and reviewed in *Crum v. Ward, supra,* and in the persuasive dissent of Justice Dove in *Caley v. Manicke* (Ill. 1961), 173 N. E. 2d 209, 217, and it is unnecessary to cite them here.

Any attempt to determine whether or not arguments suggesting dollar values for pain and suffering on a mathematical basis had influenced the jury would necessarily amount to pure speculation, as was noted by Judge Henderson in his dissent in *Harper v. Higgs, supra.* The North Dakota court in *King v. Railway Express Agency, Inc., supra,* in answer to an argument that a verdict was justified by the evidence and that defendants' counsel did not challenge its amount as excessive, said (at p. 517 of 107 N. W. 2d):

"* * * While the size of the verdict is such that we could not say that it shocks the conscience of the court, and while it may not be excessive under the evidence in this case, neither can we say that the size of the verdict was not affected by the use of such figures so improperly given to the jury. Since the definite amounts of per-week and per-year claims for pain and suffering and disability set forth on the sheet used by plaintiff's counsel are not based on any evidence, permitting the use of such formula was error."

It would appear to be impossible to assess the psychological impact on the jurors' minds of the sanctioning of per diem arguments by the trial court. The elaborate computation by counsel versed in the law, the ultimate, often "oversized", total, may well be accepted by many jurors as the proper method by which awards are calculated. Thus defense counsel are faced with the odious dilemma of either ignoring the question of the value of pain and suffering, thereby implying inability to refute opposing counsel's figures, or of arguing the point, thus lending strength to the implication that pain and suffering may be evaluated by mathematical formula. Moreover, it is probable that some juries will tend to employ the easy method of determining damages by the sug-

gested formula, rather than by independent judgment based upon the evidence itself.

It is submitted that while it may be theoretically possible, it is as a practical matter seriously doubtful, that cautionary instructions can erase the prejudicial effect of such arguments from the jurors' minds. Even though the jurors may be told that the argument is not evidence, there has been implanted in their minds (apparently with the approval of the court) the idea that pain can be evaluated at so many dollars per hour, day, week or year. That this is not a proper or reasonable inference from the evidence is manifested by the fact that no one—not even an expert witness—is permitted to testify as to his opinion of the market value of pain and suffering. To allow plaintiff's counsel to suggest to the jury an amount computed on a per diem basis is tantamount to permitting him to testify—to place before the jury what does not appear in the evidence. See *Certified T. V. and Appliance Co. v. Harrington, supra; Botta v. Brunner, supra.* It is also argued that no real harm is done in cases of excessive jury verdicts, since the court may set them aside and grant a new trial. This overlooks the sound principle that it is never desirable to sanction practice likely to produce error, and that situations requiring remedial action by the court should be avoided.

It seems to this member of the Court that approval of the per diem argument will tend to render more difficult the affording of fair and impartial trials, for which courts exist. An apt commentary on the practice is found in the words of the Missouri Supreme Court in *Faught v. Washam* (Mo. 1959), 329 S. W. 2d 588, 604, in reference to the case of *Seaboard Air Line Railroad Co. v. Braddock* (Fla. 1957), 96 So. 2d 127, cert. den., 355 U. S. 892:

> "* * * we find no more incisive and devastating critique of the mathematical formula argument than the action of a Dade County, Florida, jury in returning a verdict for $248,439, the precise amount sought by counsel in a mathematical formula argument, and the action of the Supreme Court of Florida in affirming that judgment without opinion. * * *"

434

I think the trial court should also have been reversed on this point.

Judge Henderson authorizes me to say that he concurs in this dissent.